[No. B030930. Second Dist., Div. Four. Feb. 28, 1989.]

GARLAND HARDEMAN, Plaintiff and Appellant, v.
ERWIN THOMAS et al., Defendants and Appellants.

**COUNSEL**

Tuttle & Taylor, Mark A. Borenstein, Randel L. Ledesman, Jennifer A. Miller and Elizabeth D. McMorran for Plaintiff and Appellant.

Howard Rosten, City Attorney, Jack Ballas, Assistant City Attorney, Lascher & Lascher, Edward L. Lascher, Wendy C. Lascher and Robert E. Stroud for Defendants and Appellants.

## OPINION

**GOERTZEN, J.**—After a court trial, judgment was entered annulling the June 16, 1987, run-off election for the fourth district councilmanic seat of the City of Inglewood. Ervin Thomas (Thomas), who had been declared the winner of that election; the City of Inglewood and the City Clerk for the City of Inglewood (collectively as the City) appeal from the entire judgment. Garland Hardeman (contestant), the elector who contested the election, appeals from that portion of the judgment ordering that a new run-off election be held; he asserts that the court was required to declare him the winner.

### UNDERLYING FACTS

On June 16, 1987, a run-off election for the City of Inglewood councilmanic seat number 4 was held between Thomas and contestant. On June 18, by a vote of 627 to 610, Thomas was declared the winner. A recount was conducted, and on June 24, 1987, the recount board ratified the result by a 626 to 610 margin.

As part of his campaign strategy, Thomas solicited applications for absentee ballots and organized follow-up efforts to ensure that these absentee ballots were completed and returned to the clerk. The mayor of Inglewood, Ed Vincent, was a significant Thomas supporter.

The instruction sheet, which was included with the absentee ballot materials and which was approved by the city clerk, contained in four places the direction that absentee ballots must be "personally delivered" either to the election officials or to the voting precinct on Election Day. In bold print in two places on the first page of the instruction sheet, the materials provided that "you may not give the ballot to another person to deliver for you."

Two of the completed absentee ballots were returned to the polling place by a third person. Due to her hours of work, Adele Geyen was unable to deliver her ballot to the polling place. Consequently, she entrusted it to her daughter to deliver to the polling place. Ms. Geyen freely voted for Thomas. Betty Taylor's ballot envelope was delivered by her niece to the polling place; Ms. Taylor voted freely for Thomas. Neither Ms. Geyen nor Ms. Taylor was ill or physically disabled on Election Day.

Voter Rory Osborne voted and gave his signed ballot envelope to his wife to mail. Mrs. Osborne gave it to Mayor Vincent. Mr. Osborne's ballot

envelope indicates it was not mailed, but hand-delivered to the city clerk's office. Mr. Osborne voted for Thomas.[1]

At least 13 executed absentee ballots were hand-delivered to the city clerk's office on June 16, 1987. The secretary, who checks in absentee ballots when they are returned to the clerk's office, did not recall seeing 10 or more people in line to return their ballots on election day, June 16. None of the envelopes which enclosed these ballots had a postage stamp affixed nor a postal cancellation stamp imprinted; all were stamped by the city clerk's office as having been received between 10:01 and 10:02 a.m. They were the ballots of: Sayyed Apacanis, who voted freely for Thomas; Anna Apacanis, who voted freely for Thomas; Virgie Lee Bryant, who gave her ballot to Mayor Vincent who voted freely for Thomas; Carolyn Evans, who voted freely for Thomas; Gregory Hutchinson, who voted freely for Thomas; Florentino Mandalag, who gave his completed ballot to Thomas and voted freely for Thomas; Mary McCaskill, who gave her ballot to a Thomas campaign worker, Margaret Roi, who voted freely for Thomas; Henry Robinson, who voted for Thomas; Theodore Ashley; Josie Barbar; Janice Harrison; Gwendolyn Hubbard; and Cynthia Jones. There was no evidence indicating for whom the last five voters cast their respective votes.[2]

In varying combinations, the signatures on the voter registration affidavit, the absentee ballot application, and the envelope, in which the executed absentee ballots of 13 other voters were enclosed, did not match.[3] Seven voters' signatures on their respective absentee ballot envelopes did not match those on their voter registration forms and their applications for absentee ballots. They are: Michelle Bullock; Glenda Burden; Joe Herrera; Andrea Herrera; Lee Morgon; David Jackson; Michael Lyons. Three voters' signatures on their respective voter registration forms did not match those on their applications for absentee ballot and their envelopes containing their absentee ballots. They are: Maureen Davison; Vester Magee; and

---

[1] In its findings of fact and conclusions of law, attached to this opinion as appendix A, the court found these three votes to be invalid because of their delivery to the polling place or the clerk's office by a third party. (See appen. A, pp. 8-9, 22.)

[2] The court found these 13 ballots to be invalid because they had been delivered to the clerk's office by a third party in violation of Elections Code section 1013. (See appen. A, pp. 8-12, 23.)

[3] The trial testimony on this evidence was given by James A. Black, a questioned document examiner, whom the court qualified as an expert. His professional background is as follows: six years full-time employment as a questioned document examiner; completion of the United States Army documents examiner course and a course at California State University at Los Angeles; qualification as an expert witness in the Superior Courts of Los Angeles, Kern, Orange, and San Bernardino Counties as well as the United States District Court in Los Angeles; employment as the questioned document examiner for the Cities of Westminster, Garden Grove and Fullerton; employment as a consultant by the California Attorney General's Office and the California Franchise Tax Board; and membership in four related professional associations.

Pearlie Lyons. Three voters' signatures on their respective absentee ballot applications did not match those on their voter registration forms and/or their envelopes containing their absentee ballots. They are: Theresa Margo Horton; Bernice Jones; and Robert Mitchell.[4]

One voter, Linda Odums, received an absentee ballot from a person other than the city clerk. Ms. Odums voted her absentee ballot for Thomas. On election day, Ms. Odums voted a second time for Thomas at the polling place. Both votes were counted by the city clerk.[5]

The absentee ballot envelopes containing executed ballots of two voters, Johnny Roberson and Wanda Roberson, were solicited by and delivered to a third party unsealed.[6]

Mayor Vincent visited voter Nancy Carolyn Armstrong to pick up her absentee ballot. She had not yet voted and invited the mayor into her home. He volunteered to show her how to vote. Though she did not request that he do so, the mayor took her ballot and punched in a vote for Thomas. She had not had an opportunity to read the literature but accepted the mayor's advice that Thomas "was a good guy." When the mayor punched in her ballot, Ms. Armstrong felt that he had abridged her rights because she had not had an opportunity to read the campaign literature and decide for herself. The mayor then inquired about Ms. Armstrong's daughter, Pamela. He returned later with an absentee ballot for Pamela and told Ms. Armstrong to have Pamela sign it. Pamela was present when the mayor returned with her ballot. She had not had time to study the ballot, but the mayor told her that since her mother knew everybody for whom she wanted to vote, he would punch Pamela's ballot in the same way he had punched in her mother's. The mayor punched in her ballot and took it with him. Pamela felt rushed and was made nervous by the mayor's presence. Pamela had wanted to go to the polling place and vote herself. Neither Ms. Armstrong nor Pamela was ill or suffering from any physical disability.

Two men visited voter Hope Denise Wooten. She was in a hurry and did not know for whom to vote. The men told her the numbers to punch out, which she did. They did not ask how she voted. She signed her envelope and gave it to the two men.

---

[4]The court found these 13 votes to be invalid, pursuant to Elections Code sections 1002, 1009, and 1015. (See appen. A, pp. 14-17, 23.)

[5]The court found both of Ms. Odum's votes to be invalid, pursuant to Elections Code section 1011. (See appen. A, pp. 9-10, 24.)

[6]The court found the two Roberson votes to be invalid because they were solicited unsealed and also were tainted by involuntary invasion of secrecy. (See appen. A, pp. 17-18, 23-24.)

The mayor's daughter, Valerie, visited voter Carmen Hooker to pick up her absentee ballot. Ms. Hooker had not yet completed her ballot; Valerie insisted she do it then. Though Ms. Hooker complied with Valerie's request, she was not comfortable voting at that time because she had not reviewed the election materials as was her custom. Ms. Hooker felt rushed and that she had not had time to think about her vote but did act freely when she voted.

Mayor Vincent, his daughter, Valerie, and a third person visited voter Lynda Carol Martin to pick up her absentee ballot. They asked her to fill out her ballot so they could take it. She was hesitant because she felt there "was someone looking over [her] shoulder." Though she had not thought about voting that day, she did so because she did not want to be rude. She felt uncomfortable when a person approached her while she was voting and that her privacy had been infringed upon. Ms. Martin gave the unstamped ballot envelope to one of the visitors. She was not ill or physically disabled.

A man from the Thomas campaign visited voter Sharon Douglas to pick up her absentee ballot. She had been studying, and it was late. She had not completed her ballot. The man told her there were two other people in the car outside, and all would wait for her to vote. With a list of preferred candidates in hand, which included Thomas's name, the worker sat right next to her on the couch while she voted. Her husband, Stanley Douglas, was not at home. The man told her it was all right for her to complete her husband's ballot because that was the way he and his wife always did it. After inquiring three times about the propriety of such action, Ms. Douglas voted her husband's ballot. She signed her husband's name. When she went to initial that signature, the man told her it was not necessary. She voted both ballots for Thomas.[7]

Thomas and the mayor visited voter Vinnell Lloyd and brought her a ballot. They gave her the ballot and told her what numbers to punch. She punched out number 9, which was Thomas, and three other numbers as she was instructed. She did not seal the ballot envelope. She gave it to the men to take. Ms. Lloyd had suffered a stroke and was physically disabled. Ms. Lloyd voted the way she wanted.

A Thomas campaign worker visited voter Irish Smith to pick up her absentee ballot. The worker interrupted Ms. Smith's housecleaning, but Ms.

---

[7] The court found that these seven votes were invalid because the Nancy Armstrong, Pamela Armstrong, Hope Wooten, Carmen Hooker, Lynda Martin, and Sharon Douglas votes were tainted by intimidation and an involuntary invasion of ballot secrecy, and the Stanley Douglas ballot had been signed by his wife at the insistence of the Thomas campaign worker and was tainted by involuntary invasion of ballot secrecy. (See appen. A, pp. 13-14, 23.)

Smith invited her into the house. Ms. Smith had not intended to vote, but since the worker insisted, she asked the worker to show her how to complete the ballot. The worker punched it out, and Ms. Smith signed it. She assumed she had voted for Thomas. The worker inquired about Ms. Smith's daughter, Pamela. Since Pamela worked the night shift, she was asleep. The worker filled out Pamela's ballot and asked Ms. Smith to sign Pamela's name, commenting, "We will just have her . . . vote for the same party that is on your ballot." Ms. Smith asked if this was proper and was assured by the worker that it was. She signed Pamela's name to the ballot envelope, and the worker took it with her. Both Ms. Smith and Pamela were in good health.

Two male Thomas campaign workers visited voter Julia Harris to pick up her absentee ballot. Ms. Harris told them she thought it was improper for them to pick up the ballots and that she would mail them at the appropriate time. One of the workers twice insisted that she vote at that time. After Ms. Harris completed her ballot, the worker asked about the ballot of her husband, Tommy Lee Harris. Ms. Harris informed him that her husband worked two jobs and she normally would cast her husband's vote. The man assured her it was proper for her to vote her husband's ballot and to sign his name to the ballot envelope. When Ms. Harris attempted to seal her and her husband's ballot envelopes, the worker insisted she leave them unsealed. Though she was reluctant to surrender them unsealed, Ms. Harris did so because the workers said "they were honest." Ms. Harris was in good health. Ms. Harris voted one ballot for Thomas and the other for the contestant, Hardeman.[8]

A Thomas campaign worker visited voter Ruby Curtis to pick up her absentee ballot. Ms. Curtis informed the worker that her husband, Billy Curtis, was in Mississippi and had given her permission to vote his ballot. The worker agreed this was appropriate, and Ms. Curtis voted her husband's ballot and signed his name to the ballot envelope. Both ballots were cast for Thomas. Ms. Curtis's daughter, Pamela, was present and voted her ballot. Pamela had not completed any forms prior to voting her absentee ballot. The signature appearing on Pamela's absentee ballot envelope did not match the signature on either her voter registration affidavit or her application for absentee ballot. Pamela voted for Thomas.[9]

---

[8] The court found the four votes of Lloyd, Irish Smith, Pamela Smith and Tommy Lee Harris to be invalid because they were tainted by an involuntary invasion of ballot secrecy and/or had been surrendered unsealed; in Mr. Harris's case, *at the insistence of the campaign worker*. In addition, the court found Tommy Lee Harris's vote invalid because his wife had voted his ballot and signed his name to the ballot envelope. (See appen. A, pp. 9, 12, 14, 23.)

[9] The court found the votes of Billy Curtis and Pamela Curtis to be invalid because the ballot of Mr. Curtis was signed by his wife and was tainted with involuntary invasion of privacy;

Voter Ida Berwick requested that Mayor Vincent obtain a duplicate absentee ballot for her. The city clerk, following the receipt of a declaration from Mrs. Berwick that her original ballot had been lost, entrusted a duplicate absentee ballot to Mayor Vincent. He delivered the duplicate absentee ballot to Mrs. Berwick[10]

Voter Erik Curry recalled signing an absentee ballot application but did not receive an absentee ballot. When presented an absentee ballot envelope with his signature upon it, Mr. Curry testified that he did sign his absentee ballot envelope. Frederic Woocher, a lawyer working for contestant Hardeman, spoke to Mr. Curry over the Labor Day weekend in 1987. During that conversation Mr. Curry told Mr. Woocher that "he never voted the ballot himself, that he got an absentee ballot and while he was away at work one day somebody came and picked it up."[11]

Voters Jimmy G. Jackson (age 30), Robin Marie Jackson (age 29), and Albert Jackson (age 28) are Thomas's stepchildren. At the time of the election, all three lived occasionally at two residences—at Thomas's house on Dehn Avenue and at other houses on Kenwood Avenue in Los Angeles. Thomas provided Jimmy and Albert with the down payment on a Kenwood Avenue house, which they purchased before March 1987. Jimmy and Albert have possession of the Kenwood house which they are in the process of remodeling. They often eat at Thomas's house, and have clothes and some furniture in the garage of Thomas's home on Dehn Avenue. The house on Kenwood Avenue has some furniture but is not completely furnished. Robin and her two children, ages three and seven, live in another Kenwood Avenue home with Robin's aunt; the children attend a school located outside Inglewood. All three Jacksons identified the Dehn Avenue house belonging to Thomas as their residence on their absentee ballot application and voted in the June 16 election for Thomas.[12]

The registration materials of Shirley and David Jackson list their residential address in the fourth district as 2942 West Imperial Highway, Inglewood—the address of Thomas's election headquarters. Both Thomas and

and Pamela Curtis had not been present when her voter registration affidavit and her absentee ballot application were completed and had not signed either document. (See appen. A, pp. 14-15, 23-24.)

[10] The court invalidated Ida Berwick's vote because her ballot was delivered by the mayor, a partisan campaign worker, not an election official. (See appen. A, pp. 9, 22.)

[11] Believing Mr. Woocher and disbelieving Mr. Curry, the court invalidated Mr. Curry's vote because he did not sign his absentee ballot envelope. (See appen. A, pp. 17, 23.)

[12] The court found these three Jackson votes to be invalid because the Jacksons were not domiciled within the fourth councilmanic district at least 29 days before the election. (See appen. A, pp. 11, 18, 24.)

contestant Hardeman testified that the 2900 block of Imperial Highway is a commercial area with no residences.[13]

As of August 1, 1987, contestant has lived at 3348 West 117th Street in the City of Inglewood. Prior to that time, from September 1986 to July 1987, contestant lived at 616 East Arbor Vitae in the City of Inglewood. Both residences are within the boundaries of the fourth councilmanic district. Contestant worked as a police officer on the night shift. Contestant's fiancée, now wife, lived outside the fourth district; contestant had a phone in her apartment, and at the time of trial was living there with her and her child. Contestant and his fiancée were married during the campaign period; he lived at the Arbor Vitae address but often stayed at his new wife's residence. He worked the morning watch; and after getting off work would go to the Arbor Vitae house to sleep. All his furniture and clothes were at the Arbor Vitae address.[14]

## PROCEDURAL HISTORY

On July 17, 1987, contestant filed his statement of contest against Thomas. Pursuant to Elections Code section 20050, it listed the following grounds: (1) illegal votes were cast, and (2) Thomas committed offenses against the elective franchise defined in division 1 of the Elections Code, commencing at section 29100.[15] The statement of contest recited the following supporting facts: "Numerous absentee ballots were not delivered in compliance with Election Code Section 1013 and accordingly were illegal votes that should not have been, but were in fact, counted. [¶] Upon information and belief [Thomas] and/or his agents violated, and conspired to violate several provisions of Chapter 6 of Division 17 of the Election Code, including, but not limited to, Section 29610 (aiding or abetting fraud in connection with casting votes), Section 29611 (public official aiding the illegal casting of votes), Section 29612 (interference with fair election), 29622 (gift, payment, or other consideration to induce a person to vote), Section 29630 (use of tactic of coercion or intimidation), and Section 29642 (fraudulent Absent Voter ballot signature)."

---

[13] The court found the votes of David and Shirley Jackson to be invalid because neither was domiciled within the fourth district at least 29 days prior to the election. David Jackson's vote had also been invalidated because the signature on his absentee ballot envelope differed from the signature on the absentee ballot application and the affidavit of registration. (See appen. A, pp. 16, 18, 24.)

The court also found six other votes to be illegal because these voters were not domiciled in the fourth district. (See appen. A, p. 24.) Neither Thomas nor the City challenges the trial court's conclusions with respect to these votes.

[14] The court found that contestant was an elector of the fourth councilmanic district, i.e., he was domiciled in the fourth district at least 29 days prior to June 16, 1987. (See appen. A, p. 2.)

[15] All statutory references are to the Elections Code unless otherwise indicated.

Pursuant to section 20052, on September 1, 1987, contestant served his first notice of challenged ballots; it included in excess of 350 ballots. On September 8 and September 9, 1987, contestant served supplemental notices of challenged ballots; the contested ballots were pared down to 140. All of the challenged votes on the lists served subsequent to September 1 were also listed on the September 1 notice.

In his answer to the statement of contest, Thomas listed several affirmative defenses. In summary, they were that contestant was not a qualified elector in the City, and that the statement of contest lacked specificity and, consequently, was legally insufficient.

The superior court ordered the trial to commence on September 4, 1987. Contestant moved to continue the trial date to September 22, 1987, on the grounds of insufficient time to examine the more than 400 absentee ballots in dispute. Contestant's motion was denied, and the trial commenced on September 11, 1987.

On September 11, 1987, contestant moved for an order adding as party defendants the City of Inglewood and the city clerk for the City. By stipulation, the City agreed to be named as a party defendant.

On September 14, 1987, Thomas moved the court to limit the issues of the trial to those identified in the statement of contest, to rule that third party mail-in absentee ballots are legal, and to award sanctions. The parties agreed that the issues would be limited to those in the statement of contest. The court reserved ruling on the legality of third party mail-in of absentee ballots and did not rule until the last day of trial. The record is silent regarding Thomas's request for sanctions.

Trial commenced on September 11, 1987. On the fifth and last day of trial, the court ruled that third party mail-in of absentee ballots was legal, pursuant to sections 1001 and 1013 and *Beatie* v. *Davila* (1982) 132 Cal.App.3d 424 [183 Cal.Rptr. 179].

After five days of testimony and introduction of over 100 exhibits, the court requested a written brief from contestant organizing the evidence presented. Though counsel for the City and Thomas did not see the need for such briefing, they were also invited to submit briefs. They declined to do so.

On September 25, 1987, after an entire day devoted to oral argument, the court ruled as follows: "I have, as I stated, reviewed the entire file, all of . . . my notes, all the evidence and have spent many hours in the last few

days going over my notes and the briefs and the evidence. [¶] I now find that there have been such irregularities and violations of the election laws that more than 16 illegal votes were cast for Mr. Thomas so as to invalidate the election and so that the voters in Councilmanic District No. 4 have been prevented from fairly expressing their will at the polls. [¶] Therefore, the court annuls and sets aside the June, [1987],[16] election and orders that a new election be held at a time and in the manner as required by. law."

On October 8, 1987, the court ordered a hearing to be held on October 16, 1987, on the proposed judgment and findings and fact and conclusions of law; and on the request of contestant that the court reconsider the remedy.

On October 16, 1987, the court and counsel engaged in a long and thorough discussion regarding the appropriateness of the different remedies available: whether to order a new election or to declare the contestant the winner; whether and how to apportion the illegal votes which the court could not determine for whom they were cast; whether several proposed findings were supported by clear and convincing evidence.

On October 23, 1987, the findings of fact and conclusions of law were filed. As noted above, they are attached to this opinion as appendix A. Judgment was entered that same date. In pertinent part, it provided: "It is ordered, adjudged and decreed as follows: [¶] 1. More than sixteen illegal votes were cast for Thomas in the June 16, 1987 runoff election for the fourth District Councilman for the City of Inglewood; accordingly, Thomas's election is annulled and set aside. [¶] 2. The position of Councilman for the fourth District of the City of Inglewood is vacant and the City of Inglewood is hereby ordered to conduct a new run-off election for the fourth District Councilmanic seat in accordance with Division 14, Part 2, Chapter 2, Article 2 commencing at Elections Code section 22830. [¶] 3. Any certificate of election issued by the City Clerk for the City of Inglewood to defendant Thomas declaring him to have been elected to the office of City Councilman should be cancelled and annulled, and is of no effect."

### ISSUES ON APPEAL

I. Thomas appeals, repeating his contention that the statement of contest failed to provide adequate notice of the grounds for the contest. He also asserts that the court did not apply the proper standard of review of the evidence, i.e., clear and convincing evidence; and that substantial evidence

---

[16]The trial transcript actually says "1988." Since all the other documents, the parties, and the court concur that the election occurred in 1987, and this trial occurred in 1987, it is apparent that this is a typographical error made by the transcriber.

is lacking to support the court's findings of fact, regarding the illegality of the votes and the contestant's status as an "elector."

II. The City accepts the court's determination that contestant is an "elector." It joins in Thomas's contention that procedural due process violations occurred and that substantial evidence is lacking to support the court's findings.

III. Contestant appeals, asserting that Election Code section 20087 mandates that he be declared elected to the fourth district council seat.

## STANDARD OF REVIEW

■■■ " 'It is a primary principle of law as applied to election contests that it is the duty of the court to validate the election if possible. That is to say, the election must be held valid unless plainly illegal. [Citations.] Accordingly, a distinction has been developed between mandatory and directory provisions in election laws; a violation of a mandatory provision vitiates the election, whereas a departure from a directory provision does not render the election void if there is a substantial observance of the law and no showing that the result of the election has been changed or the rights of the voters injuriously affected by the deviation. [Citations.]' (*Rideout* v. *City of Los Angeles* (1921) 185 Cal. 426, 430 [197 P. 74].) Even mandatory provisions must be liberally construed to avoid thwarting the fair expression of popular will. [Citations.] In addition, there is an express legislative policy requiring liberal construction of absentee ballot provisions in favor of the absent voter. (Elec. Code, § 1001.) The contestant has the burden of proving the defect in the election by clear and convincing evidence. [Citations.] We are, of course, bound by the trial court's determination of the facts except to the extent that they are not supported by substantial evidence. [Citations.]" (*Wilks* v. *Mouton* (1986) 42 Cal.3d 400, 404 [229 Cal.Rptr. 1, 722 P.2d 187], fn. omitted.)

■■■ Moreover, " '[t]he scope of review in an election contest is not different from other cases. Where the evidence is in conflict, this court will defer to the trial court where events at trial and demeanor of the witnesses play an important part in the decision.' " (*Escalante* v. *City of Hermosa Beach* (1987) 195 Cal.App.3d 1009, 1014 [241 Cal.Rptr. 199], quoting *Fair* v. *Hernandez* (1981) 116 Cal.App.3d 868, 874 [172 Cal.Rptr. 379].) "[W]e must consider the evidence in the light most favorable to the prevailing party giving such party the benefit of every reasonable inference, and resolv-

ing all conflicts in support of the judgment. [Citation.]" (*Wilks* v. *Mouton, supra,* 42 Cal.3d at p. 408, fn. 7.)

## I. THE APPEALS OF THOMAS AND THE CITY

By way of prefatory comment, we note that Thomas's and the City's briefs are liberally strewn with philosophical asides, editorializing about the sanctity of the finality of the electoral process and the dangers inherent in an after-the-fact judicial scrutiny of campaign practices. The record indicates that the trial court acted scrupulously to protect this most fundamental of our democratic rights. ■ We too are mindful of the care required when the judicial branch reviews a case involving the will of the voters. We are not willing, however, to sacrifice the integrity of the process on the altar of electoral finality. "[P]reservation of the integrity of the election process is far more important in the long run than resolution of any one particular election." (*Fair* v. *Hernandez, supra,* 116 Cal.App.3d 868, 881 (J. Kaufman, concurring).)[17]

*Trial Court and Clear and Convincing Evidence Standard.* Preliminarily, we reject the assertion made by both Thomas and the City that the court below failed to apply the correct standard in evaluating the evidence. In its conclusions of law, the court states, "The Court must find that a challenged vote is illegal by clear and convincing evidence." (See appen. A, p. 22.) Moreover, during the course of discussions between the court and counsel the required use of this higher standard of evaluation was noted on several occasions.

*Substantial Evidence Standard on Review.* We also find unpersuasive the contention that substantial evidence is lacking to support the court's findings of fact. After careful consideration of the entire trial transcript and a review of the documentary evidence contained in the record, we are impressed with the scrupulous consideration the court gave all the evidence. ■ Much, if not all, of Thomas's and the City's "sufficiency of the evidence" objections, in effect, seek to require us to reweigh the evidence and to disbelieve some of the testimony believed by the court. This simply is not our role. (*Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 874 [197 Cal.Rptr. 925].)

---

[17]We are particularly disturbed by section I-C of the City's opening brief. The City's reference to a subtle infusion of racial overtones in the trial and "limousine liberals" patronizing Black voters is irrelevant and offensive. We have read the entire trial transcript and have found absolutely nothing to support this suggestion.

■ Under section 20021, subdivision (d), illegal votes may not be counted in an election. "The term 'illegal votes,' . . . includes votes cast by persons not privileged to vote and votes not entitled to be counted because not cast in the manner provided by law." (*Bush* v. *Head* (1908) 154 Cal. 277, 281-282 [97 P. 512].) In addition, votes cast in violation of the criminal provisions of the Elections Code, and votes cast by persons who received their absentee ballots in an improper manner are also illegal votes. (See *Jacobson* v. *Glidden* (1978) 84 Cal.App.3d 748, 751 [148 Cal.Rptr. 825]; §§ 1007 and 1013.) In the instant case, the pertinent code sections are 17, 18, 200, 1002, 1007, 1009, 1011, 1013, 1015, 29630, and 29640, whose pertinent parts are quoted below.[18]

---

[18] Sections 17 and 18 define the terms "elector" and "voter."

Section 200 defines residence as a person's domicile, which is defined as ". . . that place in which his or her habitation is fixed, wherein the person has the intention of remaining, and to which, whenever he or she is absent, the person has the intention of returning. At a given time, a person may have only one domicile."

Section 1002 provides: Except as provided in Chapter 7 (commencing with Section 1450 application for an absent voter's ballot shall be made in writing to the elections official having jurisdiction over the election between the 29th and the 7th day prior to the election. The application shall be signed by the applicant and shall show his place of residence. Any applications received by the elections official prior to the 29th day shall be kept and processed during the application period."

Section 1007, in pertinent part, provides: "(a) Upon receipt of any absentee ballot application signed by the voter, which arrives within the proper time, the elections official should determine if the signature and residence address on the ballot application appear to be the same as that on the original affidavit of registration. The official may make this signature check upon receiving the voted ballot, but the signature must be compared before the absent voter ballot is canvassed. [¶] . . . [¶] (c) If the official determines that an application . . . is defective, and the election official is able to ascertain the voter's address, the official shall, within one working day of receiving the application, mail the voter an absent voter's ballot together with a notice. The notice shall inform the voter that the voter's absent voter's ballot shall not be counted unless the applicant provides the official with the missing information or corrects the defects prior to, or at the time of, receipt of the voter's executed absent voter's ballot. The notice shall specifically inform the voter of the information that is required or the reason for the defects in the application, and shall state the procedure necessary to remedy the defective application. [¶] If the voter substantially complies with the requirements contained in the official's notice, the voter's ballot shall be counted."

Section 1009, in pertinent part, provides: "The identification envelope shall contain the following: (a) A declaration, under penalty of perjury, stating that the voter resides within the precinct in which he or she is voting and is the person whose name appears on the envelope. [¶] (b) The signature of the voter. [¶] . . . [¶] (e) A notice that the envelope contains an official ballot and is to be opened only by the canvassing board. [¶] (f) A warning plainly stamped or printed on it that voting twice constitutes a crime."

Section 1011, in pertinent part, provides: "If it is determined that a voter has attempted to vote twice, both ballots shall be void."

Section 1013, as amended and made effective May 18, 1987, in pertinent part, provides: "All absentee ballots cast under the provisions of this division shall be voted on or before the day of the election. After marking the ballot, the absent voter shall either: (1) return the ballot by mail or in person to the official from whom it came or (2) return the ballot in person to any member of a precinct board at any polling place within the jurisdiction. However, an absent voter who, because of illness or other physical disability, is unable to return the ballot,

■ We conclude that there is substantial evidence to support the court's findings as to at least 17 of the contested votes. Since Thomas won by a margin of only 16 votes, this is all that is required to invalidate the election.

In summary, the evidence disclosed that Adele Geyen and Betty Taylor admitted that someone other than themselves delivered their absentee ballots to the polling place in contravention of section 1013; both voted for Thomas. Linda Odums admitted voting twice for Thomas; both votes must be invalidated, pursuant to section 1011. Irish Smith testified that a Thomas worker insisted she vote when she was not prepared to do so, and the worker took her ballot and punched it for Thomas. The worker then voted the ballot of Ms. Smith's daughter for Thomas, and Ms. Smith signed her daughter's name. Nancy Armstrong testified that she felt the mayor had impinged upon her rights when, without her requesting him to do so, he took her ballot and punched it for Thomas. Pamela Armstrong testified that she felt rushed and nervous by the mayor's presence when he took her ballot and punched it for Thomas. Sharon Douglas testified that a man visited her late at night and two other persons were waiting in the car for her to vote. This man sat right next to her as she voted and assured her it was appropriate for her to vote the ballot of her husband, Stanley Douglas. Both ballots were cast for Thomas. Julia Harris admitted voting and signed the ballot of her husband, Tommy Harris, for Thomas. Ruby Curtis admitted voting and signing the ballot of her husband, Billy Curtis, while he was in Mississippi. Pamela Curtis testified she had not completed *any* forms for

may designate his or her spouse, child, parent, grandparent, grandchild, brother, or sister to return the ballot to the official from whom it came or to the precinct board at any polling place within the jurisdiction. The ballot must, however, be received by either the official from whom it came or the precinct board before the close of the polls on election day."

Section 1015, in pertinent part, provides: "Upon receipt of the absentee ballot the elections official shall compare the signature on the envelope with that appearing on the affidavit of registration and, if they compare, deposit the ballot, still in the identification envelope, in a ballot container in his or her office. A variation of the signature caused by the substitution of initials for the first or middle name, or both, shall not invalidate the ballot. If the ballot is rejected because the signatures do not compare, the envelope shall not be opened and the ballot shall not be counted."

Section 29630 provides: "Every person who makes use of or threatens to make use of any force, violence, or tactic of coercion or intimidation, to induce or compel any other person to vote or refrain from voting at any election or to vote or refrain from voting for any particular person or measure at any election, or because any person voted or refrained from voting at any election or voted or refrained from voting for any particular person or measure at any election is punishable by imprisonment in the state prison for 16 months or two or three years."

Section 29640 provides: "Every person is guilty of a crime punishable by imprisonment in the state prison for 16 months or two or three years, or in county jail not exceeding one year, who: [¶] (a) Not being entitled to vote at an election, fraudulently votes or fraudulently attempts to vote at that election. [¶] (b) Being entitled to vote at an election, votes more than once, attempts to vote more than once, or knowingly hands in two or more ballots folded together at that election. [¶] (c) Impersonates or attempts to impersonate a voter at an election."

voting prior to completing her absentee ballot and the signatures on her voter registration form and absentee ballot application did not conform to her signature on the absentee ballot envelope. Vinnell Lloyd testified that the mayor and Thomas brought her a ballot, gave it to her and told her what numbers to punch. She voted for Thomas. Finally, the three Jackson stepchildren were not domiciled in the fourth councilmanic district and voted for Thomas. This summary does not even include the numerous votes invalidated because of irregularities in the signatures on the voters' registration documents, absentee ballot application, and absentee ballot envelopes or those ballots delivered by a third party to the clerk's office, *ante*.

The City argues that some of these ballots, which were voted by someone other than the voter, are valid because such action was taken with the voter's permission or was later ratified by the voter. The City cites us to no section in the Elections Code which allows for such a practice. There is none for good reason. It does not require a great imagination to envision the destructive abuses which could occur in the absentee ballot process should this be allowed.

■ We also reject the City's contention that the type of intimidation envisioned by section 29630 must be as defined in Webster's dictionary, that is, the voter must be "cowed, bulldozed, bullied and/or browbeaten" by "a display or application (as of force or learning) so as to cause fear or a sense of inferiority and a consequent submission." We have learned in our modern, advertisement-oriented society that subtle manipulation and suggestion can be a forceful and effective form of influence on our actions. In the final analysis, whether or not a voter is subject to intimidation is a question of fact, left to the trier of fact. We are satisfied that the evidence in the record amply supports the court's finding that several of these voters were intimidated by the mayor and/or other Thomas campaign workers.

Thomas contends that substantial evidence also is lacking to support the court's decision that contestant was an elector, who is domiciled in the fourth district. Thomas's argument is predicated on a reweighing of the evidence presented to the court. As noted above, this is not our function. The record provides the substantial evidence to support the court's finding in this regard.

■ Finally, the City asserts that substantial evidence is lacking to support the court's finding that the ballots which were stamped as received by the clerk's office between 10:01 and 10:02 a.m. on election day were hand-delivered. It points to testimony by Mayor Vincent that he sent these ballots by Express Mail the day before election day. Mayor Vincent did not have a receipt at trial. To have concluded that these ballots were hand-delivered, the court must have disbelieved Mayor Vincent's testimony. The

weight to be given his testimony and the credibility of the witnesses is up to the trier of fact.

 *Procedural Due Process.* Both Thomas and the City object to the adequacy of contestant's statement of contest and the various lists of challenged ballots, which were served on September 1, and September 8 and 9. They argue that they were not provided adequate notice; consequently, they lacked time to prepare a defense.

The City objects because it was not granted a continuance to prepare. The record reveals, however, that the City did not move the court for a continuance. Consequently, we shall not entertain this objection.

The claim that the statement of contest filed by contestant was insufficient is without merit. Section 20050 sets forth what must be included in the statement of contest. It requires: "(a) The name of the contestant and that he is an elector for the district or county, . . . , in which the contested election was held. [¶] (b) The name of the defendant. [¶] (c) The office. [¶] (d) The particular grounds of contest and the section of this code under which the statement is filed. [¶] (e) The date of declaration of the result of the election by the body canvassing the returns thereof." Section 20053 provides: "A statement of the grounds of contest shall not be rejected nor the proceedings dismissed by any court for want of form, if the grounds of contest are alleged with such certainty as will advise the defendant of the particular proceeding or cause for which the election is contested."

Contestant's statement of contest, quoted above, referred both to illegal votes under section 20021, subdivision (d) and to various offenses committed by Thomas or his agents against the elective franchise under section 20021, subdivision (c). It also advised that illegal votes were counted for Thomas and that when these votes were deducted from Thomas's tally, contestant had more legal votes. Nothing more is required under section 20050.

Thomas and the City further contend contestant did not precisely articulate why particular votes were illegal. Such level of detail is not required in the statement of contest. (See 28 Cal.Jur.3d, Elections, § 231, pp. 741-742.) In addition, Thomas and the City could have joined in contestant's motion for a continuance to seek further facts. The record reveals they did not.

 We further hold that contestant's notice of challenged ballots complied with section 20052. This section requires the contestant to deliver to the defendant "at least three days before the trial, a written list of the number of illegal votes, and by whom given, which he intends to prove."

The statute does not require the list to identify the legal basis for claiming that each listed voter cast an illegal vote. On September 1, 1987, three days before the then-scheduled September 4 trial date and ten days before the actual trial date, contestant served his list of challenged ballots. All of the voters in the contestant's subsequently filed but pared down lists had been included in the first list. We are aware that contestant's first list included virtually every absentee ballot cast. This was of necessity since one of the central issues of his contest was whether an absentee ballot envelope and ballot mailed by someone other than the voter complied with the requirements of section 1013. Had the court eventually ruled in contestant's favor on this issue, which it did not, all of the mailed-in ballots could well have been at issue.

■■■ Thomas objects to the length of time taken by the court to rule on his motion regarding the validity of third party mail-in of absentee ballots. On the last day of trial, the court ruled that these ballots were valid. Thomas contends that this delay in ruling hampered his defense because it "chilled" his efforts to show that third party hand-delivered ballots might have actually been third party mail-in ballots. This assertion fails because it was understood by all that third party hand-delivered ballots were not permitted. Consequently, Thomas would have risked nothing by attempting to show that some of these ballots, in fact, were mailed in by a third party.

## II. CONTESTANT'S APPEAL

■■■ Contestant's sole contention is that section 20087 mandates that he be declared elected to the Inglewood fourth district council seat.[19] He asserts that once the court made the findings of fact, invalidating a sufficient number of Thomas votes to give him the majority of the valid votes cast, it had no choice but to declare him the winner.

During the hearing on the choice of remedies available to the court, the court commented, "I think that this court is empowered under . . . section . . . 20086 . . . to and will set aside and order a new run-off election." Section 20086 provides that after the court conducts the trial on the contest and files its findings of fact and conclusions of law, it "immediately thereafter shall pronounce judgment in the premises, either confirming or annulling and setting aside the election."

In its findings of fact and conclusions of law the court offered the following rationale for its ruling: "For the following reasons, the Court concludes

---

[19] Section 20087 provides: "If in any election contest it appears that another person than the defendant has the highest number of legal votes, the court shall declare that person elected."

that it is in the best interests of the electorate that the Court annul and set aside the June 16, 1987 run-off election between Hardeman and Thomas and that a new run-off election be held rather than, under Elections Code Section 20087, declaring Hardeman elected: [¶] A. A substantial number of the votes were illegal because of failure to conform to election laws, particularly absentee voter election laws, which are ambiguous and fail to give clear direction to the voter. Examples are: the invalidation of votes delivered by a third party to the Clerk's office; the solicitation of unsealed ballot envelopes; improper signatures on absentee voter documents especially for a family member; and the failure to be timely domiciled within the fourth District. Although the Court has concluded that an absentee voter may use a third party to mail an absentee ballot to the election official, here too, uncertainty of such election laws and the cases construing such laws are traps for the unknowledgeable absentee voter. It is inconsistent and unreasonable that a third person may not personally deliver the absentee ballot but may mail the ballot. . . . [¶] B. As stated in Finding of Fact number 8, the overwhelming number of absentee ballots were cast for Thomas indicating the use of a voter method with uncertainties and difficulties in application. The Court hopes that the decision given by the Court will enable the voters to vote for the candidate of their choice unhampered by the uncertainties of the absentee voter law. [¶] C. If the proportional approach to allocate the number of illegal votes were utilized, is the proportion to be based on the total number of votes cast in the election or only the number of absentee votes cast? This uncertainty together with the nature and kind of illegality of any of the votes as described in the preceding paragraph, leads the Court to conclude that the proportional approach of allocation is inappropriate herein." (Appen. A, pp. 25-26.)

Contestant objects to the court's characterization of the invalid votes as having been based on voter confusion with the ground rules. He points to the votes invalidated because of different signatures on voter registration, absentee ballot applications, and absentee ballot envelopes; and to those voters who were domiciled out of the district but voted nonetheless. However, with the exception of a few of these voters, the court had no way of knowing for whom these votes had been cast. He further asserts that under any method the court could have chosen to apportion and deduct the illegal votes, he would remain with the majority of the legal votes cast.

While we are aware of the language of section 20087, under the particular facts of this case, we cannot conclude that the trial court acted incorrectly. The court's comments reveal that it was not convinced that it "appeared" that contestant would have the highest number of legal votes. (§ 20087.) This stemmed from the court's understandable confusion as to how to deduct the illegal "undetermined" votes cast. This uncertainty coupled with

the fact that a significant number of the voters, whose ballots properly were invalidated, testified that they voted freely for Thomas led the court to its ruling. We appreciate the trial court's reluctance to ignore these voters' choice and to frustrate their will. Section 20086 allows the court two choices; it could confirm or annul and set aside the election. As the primary purpose of the election contest provisions is to ascertain the will of the people, we conclude that the court's Herculean efforts to assure fundamental fairness to the voters of the fourth district came to an appropriate fruition when the court ordered a new election.

The entire judgment is affirmed. Each party to bear their own costs.

Woods (A. M.), P. J., and McClosky, J., concurred.

Appellants' petitions for review by the Supreme Court were denied May 24, 1989.

APPENDIX A

MARK A. BORENSTEIN
GREGORY D. SCHETINA
RANDEL L. LEDESMA
JENNIFER A. MILLER
TUTTLE & TAYLOR Incorporated
355 South Grand Avenue
Fortieth Floor
Los Angeles, California 90071-3103
(213) 683-0600

FREDRIC WOOCHER
CENTER FOR LAW IN THE PUBLIC INTEREST
10951 West Pico Boulevard
Third Floor
Los Angeles, California 90064
(213) 470-3000

Attorneys for Contestant
Garland Hardeman

**FILED**

OCT 23 1987

FRANK S. ZOLIN County Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| GARLAND HARDEMAN, | ) | CASE NO. C 654804 |
| Contestant, | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| vs. | ) | [PROPOSED] |
| | ) | |
| ERVIN "TONY" THOMAS, CITY OF | ) | |
| INGLEWOOD, AND CITY CLERK FOR | ) | |
| THE CITY OF INGLEWOOD, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

The above-entitled cause came on regularly for trial on September 11, 1987 in Department 23 of the above entitled Court, the Honorable Leon Savitch, presiding. The trial commenced on that date and continued on September 14, 16, 17, 18 and 25, 1987. Mark A. Borenstein and Fredric D. Woocher appeared as

TUTTLE &
TAYLOR
INCORPORATED

**308**

counsel for contestant Garland Hardeman; Robert Stroud appeared as counsel for defendant Ervin "Tony" Thomas; and Howard Rosten, City Attorney for the City of Inglewood, appeared for defendants City of Inglewood and Hermanita Harris, City Clerk for the City of Inglewood.

Numerous witnesses testified, and more than 100 documents were marked and received into evidence. On September 25, 1987, the Court devoted an entire day to argument. On that day, the matter was submitted for decision. The Court, having considered the evidence, the written and oral presentations made by counsel, and being fully advised, issues the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. On June 16, 1987, a runoff election was held in the City of Inglewood, County of Los Angeles, State of California, to elect a City Councilman to the Fourth District. At such election, contestant Garland Hardeman ("Hardeman") and defendant Ervin "Tony" Thomas ("Thomas") were opposing candidates.

2. Prior to 29 days before June 16, 1987, Hardeman was a qualified elector and resident of the Fourth Councilmanic District for the City of Inglewood.

3. On June 18, 1987, Hermanita Harris, the City Clerk

for the City of Inglewood, completed her official canvass of the votes cast at the election and found that a total of 627 votes had been cast for Thomas and 610 votes had been cast for Hardeman. On June 24, 1987, the City Clerk's Recount Board recounted the ballots and declared that Thomas received 626 votes to Hardeman's 610 votes. Thomas was declared elected to the office of Inglewood City Councilman.

4. On July 17, 1987, Hardeman filed his Statement of Election Contest, pursuant to California Elections Code Section 20050 claiming, inter alia, that illegal votes were cast and that Thomas had committed offenses against the election franchise. At the time of filing, Hardeman was domiciled in the Fourth District and was a qualified "elector" of the Fourth District.

5. On September 1, 1987, Hardeman served his first Notice of Challenged Ballots and on September 8 and September 9, 1987, served supplemental notices of challenged ballots. All of the challenged votes on the lists served subsequent to September 1 were also listed on the September 1 notice.

6. Defendants have not submitted any list of challenged votes.

7. On September 11, 1987, the Court granted, by stipulation of the Inglewood City Attorney ~~and counsel for~~ ~~Thomas,~~ Hardeman's motion to add the City of Inglewood and the City Clerk for the City of Inglewood as defendants.

TUTTLE &
TAYLOR
INCORPORATED

-3-

310

8. A total of 492 absentee ballots were received in connection with the June 16 election from voters whom the City Clerk determined were eligible to vote in the Fourth District. Of this total, 395 votes were cast for Thomas and 65 votes were cast for Hardeman. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ No votes were counted for either candidate in the Fourth District election on the remaining 32 absentee ballots.

9. Pursuant to California Elections Code Sections 1001, et seq., the Inglewood City Clerk established certain procedures for processing absentee ballots. Upon receipt of an absentee ballot application, copies of which were marked as Exhibits 42, 70, 74 and 114, the City Clerk delivered the application to the County Registrar so that the signature on the absentee ballot application could be checked against the voter's affidavit of registration on file with the Registrar. If the application signature matched the registration signature, the City Clerk mailed to the voter at the address reflected on the absentee ballot application, pursuant to California Elections Code Section 1007, an absentee ballot, along with voter information, a sample ballot, instructions for marking an absentee ballot and an "Identification Envelope" in which the completed absentee ballot was to be enclosed. A sample of these materials was marked as Exhibit 66.

//

//

//

10. The instruction sheet, which was included with the absentee ballot materials and which was approved by the City Clerk, contained in no less than four places the direction that absentee ballots must be "personally delivered" to either the elections officials or to the voting precinct on Election Day. Indeed, in bold writing in two places on the first page of the instruction sheet, the materials provided that "you may not give the ballot to another person to deliver for you."

11. A person voting by absentee ballot was required to punch the absentee ballot and enclose the ballot in the absentee ballot "Identification Envelope." The person was then required to sign the envelope, date the envelope and indicate his or her residence address. The signature attested under penalty of perjury that the person who signed was "a resident of and a voter in the above precinct in the City, and . . . [is] the person whose name appears on the envelope." See e.g. Exhibits 86 and 113.

12. The City Clerk and her assistants employed no procedures to determine that absentee ballot envelopes which were hand delivered to the City Clerk's Office were, in fact, hand delivered by the person named on the absentee ballot envelope, except to check that the envelope was delivered by a person of the same sex as the person named on the envelope.

13. Upon receipt by the City Clerk of an absentee

//

ballot envelope, the City Clerk or one of her assistants would date and time stamp the absentee ballot envelope and then locate the absentee ballot application for the person named on the envelope. The City Clerk or one of her assistants would note on the absentee ballot application the date the absentee ballot envelope was returned, and would compare the signature on the absentee ballot envelope with the signature on the absentee ballot application. If the signatures appeared to be the same, a checkmark was entered next to the words "does match" on the lower portion of the absentee ballot application. If the signatures did not match, the City Clerk would place a checkmark next to the notation "doesn't match" on the absentee ballot application. Ballot envelopes where the signatures matched were placed together and were opened at the close of voting on June 16, 1987. Ballot envelopes where the signatures did not match were placed in a separate grouping and were not opened. The absentee ballot envelopes with signatures which did not match were listed on the "Challenge List," which was marked as Exhibit 80, and the absentee ballots in these envelopes were not counted. Once an absentee ballot was removed from an absentee ballot envelope, the ballot itself could not be traced back to a particular absentee ballot envelope.

14. If the County Registrar reported that the signature on the absentee ballot application did not match the affidavit of registration, or if the County Registrar indicated to the City Clerk that there was some other infirmity with the registration of the person who submitted the absentee ballot application, the

City Clerk did not mail an absentee ballot to the person. Instead, the City Clerk mailed to the absentee ballot applicant a letter which advised the person of the problem with the registration. A copy of the letter sent in connection with the June 16 election was marked as Exhibit 79. Sixty-seven applicants were sent a copy of this letter between June 1 and June 12. Kimberlyn Lightfoot was sent a copy of Exhibit 79 on June 12, 1987 by Deputy Clerk Helen Paz.

15. Defendant Thomas and his campaign committee, which was called the "Friends of Tony Thomas," employed an aggressive absentee ballot solicitation program. Among other things, Thomas and his campaign workers registered voters, provided absentee ballot application forms to voters, collected the absentee ballot applications from voters and copied them at Thomas' campaign headquarters, mailed or delivered completed applications to the City Clerk and, after the City Clerk mailed the absentee ballots to the voters, solicited and collected absentee ballots for delivery either in person or by mail to the City Clerk.

16. A large number of (LJ) absentee ballot envelopes, which contained absentee ballots, were brought by Thomas campaign workers to Thomas campaign headquarters, where they were collected and subsequently delivered to the City Clerk.

17. After an absentee ballot application was collected from a voter and delivered to the City Clerk, Thomas and/or workers on his campaign returned to the voter's home to collect

TUTTLE &
TAYLOR
INCORPORATED

-7-

the absentee ballot. In many instances, the voter did not request that the absentee ballot be collected. Moreover, Thomas or the campaign worker often appeared at an inconvenient time and often before the voter was prepared to vote. In at least five instances, the person who came to pick up the absentee ballot envelope from the voter insisted that the envelope be surrendered unsealed. In several cases, the person who came to collect the absentee ballot requested that someone other than the person named on an absentee ballot envelope punch and/or sign the absentee ballot envelope in the name of the absent voter; when individuals questioned the propriety of such actions, they were assured by the persons soliciting the absentee ballots that it was proper to sign the ballot envelope for another family member. Absentee ballot solicitors also misrepresented what they intended to do with the absentee ballot envelope once it was collected and/or misrepresented that the absentee ballot had to be completed and surrendered to them at the time of solicitation in order for the ballot to count. Other misrepresentations were also made which induced an absentee voter to sign improperly the ballot envelope of another, to relinquish an absentee ballot to a solicitor, to vote in a particular way and/or to permit a campaign worker to punch the ballot for a voter who did not require assistance.

## The Challenged Votes

18. Adele Geyen's absentee ballot was hand delivered by a third party to a polling place on Election Day. Ms. Geyen

voted for Thomas.

19. Betty Taylor's absentee ballot was hand delivered by a third party to a polling place on Election Day. Ms. Taylor voted for Thomas.

20. Rory Osborne's absentee ballot was given to Mayor Edward Vincent for delivery to the City Clerk's office. Mr. Osborne's ballot was hand delivered by a third party to the City Clerk's office on June 3, 1987. Mr. Osborne voted for Thomas.

21. Ida Berwick, after having applied for an absentee ballot prior to the close of the period for requesting an absentee ballot, requested Mayor Vincent to obtain a duplicate absentee ballot for her. The City Clerk, following the receipt of a declaration from Mrs. Berwick that her original ballot had been lost, entrusted a duplicate absentee ballot to Mayor Vincent who delivered the duplicate absentee ballot to Mrs. Berwick. Mrs. Berwick voted for Thomas.

22. Vinnell Lloyd received an absentee ballot from Mayor Vincent. In addition, Mrs. Lloyd's vote was tainted by ~~coercion, misrepresentation and~~ the involuntary invasion of ballot secrecy. Her absentee ballot was also solicited unsealed. Mrs. Lloyd voted for Thomas.

23. Linda Odums received an absentee ballot from a person other than the City Clerk. Mrs. Odums voted her absentee

ballot for Thomas. On Election Day, Linda Odums also voted for Thomas at the polling place for the 37th Precinct. Both votes were counted by the City Clerk.

24. Sayed Apacanis' absentee ballot was hand delivered to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. Mr. Apacanis voted for Thomas.

25. Anna Apacanis' absentee ballot was hand delivered to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. Mrs. Apacanis voted for Thomas.

26. Virgie Lee Bryant's absentee ballot was hand delivered to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. Ms. Bryant voted for Thomas.

27. Carolyn Evans' absentee ballot was hand delivered to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. Ms. Evans voted for Thomas.

28. Gregory Hutchinson's absentee ballot was hand delivered to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. Mr. Hutchinson voted for Thomas.

29. Florentino Mandalag's absentee ballot was hand

//

delivered to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. Mr. Mandalag voted for Thomas.

30. Mary McCaskill's absentee ballot was hand delivered to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. Ms. McCaskill voted for Thomas.

31. Henry Robinson's absentee ballot was hand delivered to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. Mr. Robinson voted for Thomas.

32. Albert Jackson's absentee ballot was hand delivered to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. In addition, Mr. Jackson was not domiciled in the Fourth District at least 29 days prior to June 16, 1987. Mr. Jackson voted for Thomas.

33. Theodore Ashley's absentee ballot was hand delivered to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. The Court cannot determine for whom Mr. Ashley voted.

34. Josie Barbar's absentee ballot was hand delivered

//
//

to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. The Court cannot determine for whom Ms. Barbar voted.

35. Janice Harrison's absentee ballot was hand delivered to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. The Court cannot determine for whom Ms. Harrison voted.

36. Gwendolyn Hubbard's absentee ballot was hand delivered to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. The Court cannot determine for whom Ms. Hubbard voted.

37. Cynthia Jones' absentee ballot was hand delivered to the City Clerk's office by a third party between 10:01 am and 10:02 am on June 16, 1987. The Court cannot determine for whom Ms. Jones voted.

38. The vote of Irish Smith was tainted by ~~intimidation, coercion and~~ an involuntary invasion of ballot secrecy. Mrs. Smith's vote was cast for Thomas.

39. The vote of Pamela Smith was tainted by ~~intimidation, coercion, misrepresentation and~~ an involuntary invasion of ballot secrecy. In addition, Ms. Smitn did not sign the absentee ballot envelope bearing her name. Ms. Smith's vote was cast for Thomas.

40. The vote of Nancy Armstrong was tainted by intimidation, ~~coercion~~ and an involuntary invasion of ballot secrecy. In addition, Mrs. Armstrong did not request assistance in punching her ballot and her ballot was punched by Mayor Vincent. Mrs. Armstrong's vote was cast for Thomas.

41. The vote of Pamela Armstrong was tainted by ~~coercion~~, intimidation and an involuntary invasion of ballot secrecy. Ms. Armstrong did not request assistance in punching her absentee ballot, but Mayor Vincent punched Ms. Armstrong's ballot. In addition, Ms. Armstrong's ballot envelope was solicited unsealed. Ms. Armstrong's vote was cast for Thomas.

42. The vote of Hope Denise Wooten was tainted by ~~coercion~~, intimidation and ~~misrepresentation~~ *an involuntary invasion of ballot secrecy*. The Court is unable to determine for whom Ms. Wooten voted.

43. The vote of Carmen Hooker was tainted by ~~coercion~~ intimidation. The Court is unable to determine for whom Ms. Hooker voted.

44. The vote of Linda Martin was tainted by ~~coercion~~, intimidation and an involuntary invasion of ballot secrecy. The Court is unable to determine for whom Ms. Martin voted.

*45. Blank*

~~45. The vote of illicit tribble was tainted by~~

~~coercion, intimidation and an involuntary invasion of ballot~~
~~secrecy. Mr. Tribble voted for Thomas.~~

46. The vote of Sharon Douglas was tainted by intimidation, ~~coercion,~~ an involuntary invasion of ballot secrecy ~~and misrepresentation~~. Ms. Douglas voted for Thomas.

47. The ballot envelope of Stanley Douglas was signed by Sharon Douglas at the insistence of a Thomas campaign worker at a time when Mr. Douglas was not at home. Mr. Douglas' vote was also tainted by an involuntary invasion of ballot secrecy ~~and misrepresentation.~~ Mr. Douglas' vote was cast for Thomas.

48. The ballot envelope for Tommy Lee Harris was signed, at the insistence of a Thomas campaign worker, by his wife Julia Harris, at a time when Mr. Harris was away from home. In addition, Mr. Harris' vote was tainted by an involuntary invasion of ballot secrecy ~~and misrepresentation~~. Also, the Thomas campaign worker insisted that Mr. Harris' ballot envelope be surrendered unsealed. Mr. Harris' vote was cast for Thomas.

49. Pamela Curtis was not present at the time she was registered to vote and did not sign the voter registration affidavit filled out in her name. Accordingly, Ms. Curtis was not validly registered at the time of the June 16 election. Ms. Curtis voted for Thomas.

50. Pearlie Lyons did not sign the voter registration

TUTTLE &
TAYLOR
INCORPORATED

-14- 361

affidavit filled out in her name. Accordingly, Ms. Lyons was not validly registered at the time of the June 16 election. The Court is unable to determine for whom Mrs. Lyons' vote was cast.

51. Bernice Jones did not sign the absentee ballot application which reflected her name. The Court is unable to determine for whom Ms. Jones' vote was cast.

52. Teresa Horton did not sign the absentee ballot application which reflected her name. The Court is unable to determine for whom Ms. Horton's vote was cast.

53. The signature on the absentee ballot envelope for Glenda Burdine differed from the signature on the absentee ballot application and the affidavit of registration for Ms. Burdine. The Court is unable to determine for whom Ms. Burdine's vote was cast.

54. The signature on the absentee ballot envelope for Michelle Bullock differed from the signature on the absentee ballot application and the affidavit of registration for Ms. Bullock. The Court is unable to determine for whom Ms. Bullock's vote was cast.

55. The ballot envelope of Billy Curtis was signed by his wife, Ruby Curtis, at the insistence of a Thomas campaign worker at a time when Mr. Curtis was not at home. Mr. Curtis' vote was cast for Thomas.

56. The signature on the absentee ballot envelope for Joe Herrera differed from the signature on the absentee ballot application and the affidavit of registration for Mr. Herrera. The Court is unable to determine for whom Mr. Herrera's vote was cast.

57. The signature on the absentee ballot envelope for Andrea Herrera differed from the signature on the absentee ballot application and the affidavit of registration for Mrs. Herrera. The Court is unable to determine for whom Mrs. Herrera's vote was cast.

58. The signature on the absentee ballot envelope for Lee Morgan, Jr. differed from the signature on the absentee ballot application and the affidavit of registration for Mr. Morgan. The Court is unable to determine for whom Mr. Morgan's vote was cast.

59. The signature on the absentee ballot envelope for Michael Lyons differed from the signature on the absentee ballot application and the affidavit of registration for Mr. Lyons. The Court is unable to determine for whom Mr. Lyons' vote was cast.

60. The signature on the absentee ballot envelope for David Jackson differed from the signature on the absentee ballot application and the affidavit of registration for Mr. Jackson. In addition, Mr. Jackson was not domiciled in the Fourth

District at least 29 days prior to June 16, 1987. His registration, application for an absentee ballot and the ballot envelope listed Thomas campaign headquarters as his residence where no residence existed. Mr. Jackson's vote was cast for Thomas.

61. The absentee ballot envelope for Maureen Davison differed from the signature on the absentee ballot application and the affidavit of registration for Mrs. Davison. In addition, Ms. Davison was not domiciled within the Fourth District at least 29 days prior to June 16, 1987. The Court is unable to determine for whom Ms. Davison's vote was cast.

62. Vester Magee did not sign either his absentee ballot application or his absentee ballot envelope. The Court is unable to determine for whom Mr. Magee's vote was cast.

63. The signature on the absentee ballot envelope for Robert Mitchell differed from the signature on the absentee ballot application and the affidavit of registration for Mr. Mitchell. Mr. Mitchell's vote was cast for Thomas.

64. Erik Curry did not sign his absentee ballot envelope. Mr. Curry's vote was cast for Thomas.

65. ▆▆▆▆ Johnny Roberson ▆▆▆▆▆▆▆ by ▆▆▆▆▆▆▆▆▆▆▆▆ absentee ballot envelope was

//

solicited unsealed. The Court is unable to determine for whom Mr. Roberson voted.

66. ~~The~~ ~~of~~ Wanda Roberson ~~was~~ ~~absentee ballot envelope was~~ absentee ballot envelope was solicited unsealed. The Court is unable to determine for whom Ms. Roberson voted.

67. Jimmy G. Jackson, Jr. was not domiciled within the Fourth District at least 29 days prior to June 16, 1987. Mr. Jackson voted for Thomas.

68. Robin Marie Jackson was not domiciled within the Fourth District at least 29 days prior to June 16, 1987. Ms. Jackson voted for Thomas.

69. Shirley Jackson was not domiciled within the Fourth District at least 29 days prior to June 16, 1987. Her registration, application for an absentee ballot and ballot envelope listed Thomas campaign headquarters as her residence where no residence existed. Ms. Jackson voted for Thomas.

70. Mark Davison was not domiciled within the Fourth District at least 29 days prior to June 16, 1987. The Court is unable to determine for whom Mr. Davison voted.

71. Kimberlyn Lightfoot was not domiciled within the

//

Fourth District at least 29 days prior to June 16, 1987. The Court is unable to determine for whom Ms. Lightfoot voted.

72. Hoyt Sims was not domiciled within the Fourth District at least 29 days prior to June 16, 1987. The Court is unable to determine for whom Mr. Sims voted.

73. Gilbert Hardin, Jr. was not domiciled within the Fourth District at least 29 days prior to June 16, 1987. The Court is unable to determine for whom Mr. Hardin voted.

74. George Alex Williams, Jr. was not domiciled within the Fourth District at least 29 days prior to June 16, 1987. The Court is unable to determine for whom Mr. Williams voted.

75. Josetta Williams was not domiciled within the Fourth District at least 29 days prior to June 16, 1987. The Court is unable to determine for whom Mrs. Williams voted.

76. The Court has listened to and carefully considered the testimony of all of the witnesses. The Court has observed the demeanor of the witnesses and has evaluated their credibility.

77. Any finding of fact that is deemed to be a conclusion of law shall be considered a conclusion of law.

<u>CONCLUSIONS OF LAW</u>

1. "It is the primary purpose of the election contest provisions to ascertain the will of the people and to make certain that mistake or fraud has not frustrated the public volition." Enterprise Residence Etc. Committee v. Brennan, 22 Cal. 3d 767, 774 (1978).

2. Recognizing that free and honest elections are the very foundation of our republican form of government, two complementary principles apply in adjudicating election contests. The first is that "it is the duty of the court to validate the election if possible." Rideout v. City of Los Angeles, 185 Cal. 426, 430 (1921). But equally important is the principle that "preservation of the integrity of the election process is far more important in the long run than resolution of any one particular election." Fair v. Hernandez, 116 Cal. App. 3d 868, 881 (1981) (Kaufman, J., concurring). See Scott v.Kenyon, 16 Cal. 2d 197 (1940).

3. However, "[t]he policy in favor of upholding elections appears in the cases in conjunction with the rule that 'technical errors or irregularities arising in carrying out directory provisions which do not effect the result will not avoid the election.' Both the policy and the rule manifest the fact that 'courts are reluctant to defeat the fair expression of popular will in elections;' neither [rule] has been invoked to uphold an election in the face of illegalities which affected the result--a situation in which the will of the

people may be thwarted by upholding an election." <u>Canales v. City of Alviso</u>, 3 Cal. 3d 118, 127 (1970)(citations omitted; emphasis in original).

4. The Legislature has established statutory prerequisites for voting, and a "violation of a mandatory provision vitiates the election." <u>Rideout v. City of Los Angeles</u>, 185 Cal. 426 at 430. In the area of absentee voting, the Legislature has expressed its intent with even more specificity. Due to the "potential for abuse" and "the serious danger of coercion and fraud in the absent voter balloting process," the Legislature recently enacted urgency legislation, S.B. 133, declaring its intent that any absentee ballot cast in violation of the Elections Code provisions "cannot be counted, particularly when such a ballot would affect the result of the election." S.B. 133, Sections 1(d) and 4. The decisions of the Courts of Appeal in <u>Fair v. Hernandez</u> and <u>Wilks v. Mouton</u>, were expressly approved by the Legislature. "The integrity and secrecy of the process are such important interests that ballots may be voided even though it is not shown that the ballots were actually tampered with." <u>Fair v.Hernandez</u>, 138 Cal. App. 3d 578, 583 (1982); <u>Wilks v. Mouton</u>, 205 Cal. Rptr. 735, 741 (1984).

5. As is clear from the language of S.B. 133, even absentee ballots cast in violation of only directory provisions of the Elections Code must be nullified if the ballots would affect the result of the election, without any demonstration of actual fraud, tampering or coercion. <u>See</u> S.B. 133, Section

1(d).

6. Under Elections Code Section 20021(d), illegal votes may not be counted in an election. "The term 'illegal votes' . . . includes votes cast by persons not privileged to vote, as well as votes not entitled to be counted because not cast in the manner provided by law." Bush v. Head, 154 Cal. 277, 283 (1908). In addition, votes cast in violation of the criminal provisions of the Election Code, see Jacobson·v. Glidden, 84 Cal. App. 3d 748, 751 (1978), and votes cast by persons who received their absentee ballots in an improper manner may not be counted. See Cal. Elect. Code Sections 1007 and 1013. The Court must find that a challenged vote is illegal by clear and convincing evidence.

7. The absentee votes of Adele Geyen, Betty Taylor and Rory Osborne are illegal votes because their absentee ballots were hand delivered by a third party to the polling place or to the election official. See Cal. Elect. Code Section 1013. The absentee votes of Ida Berwick, Vinnell Lloyd and Linda Odums may not be counted because their absentee ballots were delivered in a manner not authorized by California Elections Code Section 1007. Cf. Cal. Elect. Code Section 1017 (specifying the limited circumstances an authorized representative may obtain or deliver an absentee ballot for another).

8. The absentee ballots of Sayed Apacanis, Anna Apacanis, Virgie Lee Bryant, Carolyn Evans, Gregory Hutchinson,

Florentino Mandalag, Mary McCaskill, Henry Robinson, Albert Jackson, Theodore Ashley, Josie Barbar, Janice Harrison, Gwendolyn Hubbard, and Cynthia Jones may not be counted because their ballots were hand delivered by one or more third parties to the City Clerk in violation of Elections Code Section 1013.

9. The absentee votes of Irish Smith, Pamela Smith, Nancy Armstrong, Pamela Armstrong, Hope Denise Wooten, Carmen Hooker, Linda Martin, Alicia Tribble, Johnny Roberson, Wanda Roberson, Stanley Douglas, Tommie Lee Harris, Vinnell Lloyd, Billy Curtis and Sharon Douglas are illegal votes and may not be counted inasmuch as each of these votes were tainted by ~~intimidation~~ ~~coercion~~ intimidation, involuntary invasion with the secrecy of the ballot process, ~~and/or misrepresentation~~. Cal. Elect. Code Sections 29630 and 29640.

10. The absentee ballots of Tommy Lee Harris, Stanley Douglas, Pamela Curtis, Pearlie Lyons, Bernice Jones, Teresa Horton, Glenda Burdine, Michelle Bullock, Billy Curtis, Joe Herrera, Andrea Herrera, Lee Morgan, Jr., Michael Lyons, David Jackson, Maureen Davison, Vester Magee, Robert Mitchell, and Erik Curry may not be counted inasmuch as these voters did not sign their absentee ballot envelopes and/or applications for absentee ballots. See Cal. Elect. Code Sections 1002, 1009 and 1015.

11. The absentee ballots of Johnny Roberson, Wanda

//

Roberson, Vinnell Lloyd, Pamela Armstrong and Tommie Lee Harris may not be counted inasmuch as their absentee ballot envelopes were solicited unsealed. In the Court's view, an unsealed ballot presents a prime opportunity for fraud because of the ease with which the voter's will could be altered.

12. The following voters cast illegal votes because they were not domiciled in the Fourth District at least 29 days prior to the June 16, 1987 election: Jimmy G. Jackson, Jr., Robin Marie Jackson, Albert Jackson, David Jackson, Shirley Jackson, Mark Davison, Maureen Davison, Kimberlyn Lightfoot, Hoyt Sims, Gilbert Hardin, Jr., George Alex Williams, Jr. and Josetta Williams. See generally, Cal. Elect. Code Sections 17, 18 and 200; Garrison v. Rourke, 32 Cal. 2d 430, 441 (1948).

13. Linda Odums voted both by absentee ballot and in person at the polls. Both votes cast by Mrs. Odums are illegal. Cal. Elect. Code Section 1011.

14. Based on direct and circumstantial evidence, the Court concludes that the following illegal votes were cast for Thomas: Adele Geyen, Betty Taylor, Rory Osborne, Ida Berwick, Vinnell Lloyd, Linda Odums (two votes), Sayed Apacanis, Anna Apacanis, Virgie Lee Bryant, Carolyn Evans, Gregory Hutchinson, Florentino Mandalag, Mary McCaskill, Henry Robinson, Albert Jackson, Irish Smith, Pamela Smith, Nancy Armstrong, Pamela Armstrong, , Sharon Douglas, Tommy Lee Harris,

//

Stanley Douglas, Billy Curtis, Pamela Curtis, David Jackson, Robert Mitchell, Erik Curry, Jimmy G. Jackson, Jr., Robin Marie Jackson and Shirley Jackson.

15. The Court is unable to determine for whom the following persons cast their illegal votes: Theodore Ashley, Josie Barbar, Janice Harrison, Gwendolyn Hubbard, Cynthia Jones, Hope Denise Wooten, Carmen Hooker, Linda Martin, Pearlie Lyons, Bernice Jones, Teresa Horton, Glenda Burdine, Michelle Bullock, Joe Herrera, Andrea Herrera, Lee Morgan, Jr., Michael Lyons, Maureen Davison, Vester Magee, Johnny Roberson, Wanda Roberson, Mark Davison, Kimberlyn Lightfoot, Hoyt Sims, Gilbert Hardin, Jr., George Alex Williams, Jr. and Josetta Williams.

16. For the following reasons, the Court concludes that it is in the best interests of the electorate that the Court annul and set aside the June 16, 1987 run-off election between Hardeman and Thomas and that a new run-off election be held rather than, under Elections Code Section 20087, declaring Hardeman elected:

A. A substantial number of the votes were illegal because of failure to conform to election laws, particularly absentee voter election laws, which are ambiguous and fail to give clear direction to the voter. Examples are: the invalidation of votes delivered by a third party to the Clerk's office; the solicitation of unsealed ballot envelopes; improper signatures on absentee voter documents especially for a family member; and the failure to be timely domiciled within the Fourth District. Although the Court has concluded that an absentee voter may use a

-25-

third party to mail an absentee ballot to the election official, here too, uncertainty of such election laws and the cases construing such laws are traps for the unknowledgeable absentee voter. It is inconsistent and unreasonable that a third person may not personally deliver the absentee ballot but may mail the ballot. In the words of Justice Grodin, in his concurring opinion in <u>Wilkes v. Mouton</u>, 42 Cal.3d 400 at page 415: "I strongly suggest, however, that there is a need in this arena for prophylactic rules which the legislature is in the best position to provide."

B. As stated in Finding of Fact number 8, the overwhelming number of absentee ballots were cast for Thomas indicating the use of a voter method with uncertainties and difficulties in application. The Court hopes that the decision given by the Court will enable the voters to vote for the candidate of their choice unhampered by the uncertainties of the absentee voter law.

C. If the proportional approach to allocate the number of illegal votes were utilized, is the proportion to be based on the total number of votes cast in the election or only the number of absentee votes cast? This uncertainty together with the nature and kind of illegality of any of the votes as described in the preceding paragraph, leads the Court to conclude that the proportional approach of allocation is inappropriate herein.

17. Pursuant to Elections Code Section 20086, the Court annuls and sets aside the June 16, 1987 run-off election between Hardeman and Thomas. Pursuant to Elections Code Section 20111, if

-26-

a certificate of election has been issued to Thomas, it is hereby annulled. The office of Fourth District Councilman for the City of Inglewood is declared to be vacant.

18. Hardeman was a qualified elector of the Fourth District at least 29 days prior to June 16, 1987 and on July 17, 1987.

19. An absentee voter may utilize a third party to mail a marked absentee ballot to the election official. Unless there is some tampering, coercion, fraud, criminal conduct or some other legal infirmity as to the ballot, the absentee ballot will be counted.

20. Any conclusion of law which is determined to be a finding of fact, shall be considered a finding of fact.

Dated: October 23, 1987

_____
Leon Savitch
Judge of the Superior Court

-27-

601

76T576T- PS 12-84