[No. S028315. June 1, 1993.]

CHARLES GOOCH et al., Plaintiffs and Respondents, v.
HANK HENDRIX et al., Defendants and Appellants.

COUNSEL

Anthony P. Capozzi for Defendants and Appellants.

Perez, Makasian & Williams and Rayma Church for Plaintiffs and Respondents.

OPINION

**LUCAS, C. J.**—May an election be annulled on clear and convincing evidence of illegal voting when it appears the illegal votes affected the outcome of the election, but it cannot otherwise be determined precisely for whom the illegal votes were cast?

We conclude the controlling statute, Elections Code section 20024,[1] authorizes the annulment of a contested election under such circumstances. Accordingly, we reverse the contrary judgment of the Court of Appeal.

## I. FACTS

### A. The Election

On November 5, 1991, consolidated elections were held in Fresno County for school board positions in one high school and four elementary school districts. Two positions were open on the Washington Union High School District Board, three positions were open on the Orange Center Elementary School District Board, two positions were open on the Pacific Union Elementary School District Board, three positions were open on the West Fresno Elementary School District Board, and two positions were open on the West Park Elementary School District Board. The four elementary schools are "feeder schools" for Washington Union High School; voters in each elementary school district received a ballot allowing them to vote for candidates for openings on their respective elementary school district boards, as well as for the Washington Union High School District Board.

---

[1] All further statutory references are to this code unless otherwise indicated.

On November 19, 1991, the results of the elections were certified by the Fresno County Clerk as follows (the names of the winning candidates are capitalized):

### Orange Center

| | |
|---|---|
| LINDA ANDREWS (short term) | 103 |
| TIM SANDERS (full term position) | 95 |
| SAM HEARNES (full term position) | 82 |
| John Graham | 65 |
| Lilo Santellano | 60 |
| Gene Balthrop | 56 |

### Pacific Union

| | |
|---|---|
| LAWRENCE CATO | 358 |
| ROSEMARY GARCIA | 316 |
| Roland Lawrence | 189 |
| Delbert Cederquist | 175 |
| Tami Gandy | 80 |
| Toni Nagai | 70 |

### West Fresno

| | |
|---|---|
| HANK HENDRIX | 306 |
| OSCAR ROBINSON | 292 |
| TONY TAYLOR | 270 |
| Charles Gooch | 114 |
| Nadine Otschkal | 81 |
| Nancy Jones | 67 |

### West Park

| | |
|---|---|
| STEVE FRANKLIN | 93 |
| CARRIE SCHOALS | 79 |
| Ernest Morales | 69 |
| Ed Randolph | 57 |

### Washington Union

| | |
|---|---|
| MEL SANDERS | 1,015 |
| MARY BESS | 902 |
| Frank Butterfield | 744 |
| Jim Coito | 744 |
| Lucky Archuleta | 237 |
| Grant Mitchell | 209 |

## B. *The Absentee Voter Campaign*

In July 1991, the Fresno Chapter of the Black American Political Association of California (BAPAC) launched its Voter Education Project (VEP). The project was described by Mel Sanders, president of the Fresno Chapter of BAPAC,[2] in his October 1991 written report to the statewide annual BAPAC conference in Sacramento, as follows:

"This project has targeted 13 seats of several of the smaller school district boards that serve the southwest urban area of metropolitan Fresno. The central strategy in the election involves a highly selective process of both voter registration and absentee ballot applications. With some $10,000 in cash, equipment and materials, we are projecting a landslide in seven of the elections and comfortable wins in the others."

Frank Revis, a BAPAC member, was appointed director of VEP. Revis recruited his family members, BAPAC members and their families, and other nonmembers of BAPAC, as volunteers for the project. Some VEP workers were also paid.

The trial court made the following findings of fact, among others, regarding the manner in which VEP's voter registration and absentee ballot "strategies" were effectuated (numerical paragraph designations and references to trial exhibits have been omitted):

"A BAPAC solicitor would visit registered and unregistered voters' residences to ask the resident to sign a registration affidavit and an absentee ballot application for the coming election. The prospective voter would be told that BAPAC would mail the executed documents to the Elections Clerk and, when the ballot was received from the Clerk by BAPAC, it would hand-deliver the ballot to the voter.

"Paragraph Three of the absentee ballot application form which called for the address to which the voter wants the ballot to be mailed by the Clerk, was with a few exceptions, never filled out by the voter. In some instances the paragraph was preaddressed and signed by the voter. In most instances, the application was left blank when the voter signed the application and [was] filled in by BAPAC later.

---

[2]Mel Sanders, himself a candidate for an open board position in the Washington Union High School District, received the highest number of votes in that election. Mary Bess, a BAPAC member, received the second highest number of votes in that contest. Hank Hendrix, an officer in the statewide BAPAC organization, and Oscar Robinson, also a BAPAC member, received the first and second highest number of votes in the contest for the West Fresno Elementary School District Board. All four are named in the election contest as defendants.

"The BAPAC solicitor would take the executed documents to BAPAC headquarters where a BAPAC address would be written on the application form as the address to which the voter wanted the ballot mailed. BAPAC would hand carry the registration and application forms to the Clerk.

"When BAPAC received the absentee ballots from the Clerk, it would identify from its records the school district in which the voter resided; it would notify Voter Education Project workers, the candidate and/or [the] candidate's workers to pick up the ballot for delivery to the voter. Ballots were delivered to voters either by BAPAC members, volunteers, paid workers, or by the candidates themselves.

"If a voter was not home when delivery of the ballot was attempted, a notice was left at the door asking the voter to call a BAPAC telephone number listed on the notice so the ballot could be delivered to the voter as soon as possible.

"When a ballot was delivered, the voter was encouraged to vote in the presence of the solicitor. In some instances, the solicitor would offer to answer questions about the candidates or issues. After the voter punched the appropriate number opposite the candidate names, the voter would place the ballot in the envelope, seal, sign and date the envelope and hand it to the solicitor. The solicitor would then return the envelope containing the ballot to BAPAC headquarters where it would be mailed to the Clerk.

"Prior to the election, [VEP Director] Frank Revis and [BAPAC Fresno Chapter President] Mel Sanders met with Susan Anderson, the Fresno County Clerk, and Norma Logan, the head of the Elections Division of the Clerk's Office. One purpose of the meeting was to be sure the applications for absentee ballots being distributed by BAPAC conformed to law. Revis revealed that BAPAC had already obtained a large number of absentee ballot applications—by his own estimate, approximately 800. A number of these applications were then examined by Anderson and Logan who raised concerns that someone other than the voter was completing the portion of the application specifying the address to which the ballot was to be sent (Paragraph 3). Revis' attention was directed to Elections Code § 1006 which provides that the voter must 'personally affix[]' the address in Paragraph 3. BAPAC chose to ignore this warning and to follow its own ideas about permissible absentee ballot application and mailing procedures.

"During their meeting, Anderson and Logan sought some assurance from Revis that BAPAC was not a political organization and that the ballots would not come into the possession of any candidates. Revis assured them

that candidates would not have access to ballots and that BAPAC was not sponsoring candidates.

"Subsequently, 1,292 completed [absentee ballot] applications were submitted in which paragraph 3 specified one of two BAPAC addresses, 2017 Tuolumne or 9584 South Chestnut. Anderson and Logan believed these applications did not comply with Elections Code § 1006 because the address in Paragraph 3 was not personally affixed by the voter. Anderson and Logan also suspected BAPAC was a political organization which should not receive absentee ballots under Elections Code § 1006.

"BAPAC was unable to secure the ballots at 2017 Tuolumne, where it shared space with another entity, and so Revis filed a request with the postmaster that all absentee ballots sent to 2017 Tuolumne [were] to be held for pickup by BAPAC. No hold arrangement was made with respect to 9854 S. Chestnut, though that address was a rural postal box, also incapable of holding and securing all the ballots. Eventually, all the absentee ballots sent to BAPAC addresses were delivered to 705 Mayer, the headquarters of the Voter Education Project [which was also Revis' home address].

"Absentee ballots were provided Defendants Mel Sanders, Oscar Robinson, Linda Andrews, Tim Sanders, Samuel Hearnes, Mary Bess, Lawrence Cato, Tony Taylor, Steve Franklin, and Carrie Schoals directly by the Voter Education Project for delivery to voters. Lawrence Cato gave some ballots to Defendant Rosemary Garcia for delivery to voters."

## C. *The Elections Contest*

On December 19, 1991, respondents, unsuccessful candidates in the consolidated elections, filed suit to contest the election results pursuant to section 20021.[3] The complaint alleged: (1) appellants had given or offered bribes to electors; (2) appellants had committed offenses against the elective franchise; and (3) illegal votes were cast sufficient to change the results of the elections.

---

[3]Section 20021 states:

"Any elector of a county, city, or of any political subdivision of either may contest any election held therein, for any of the following causes: [¶] (a) That the precinct board or any member thereof was guilty of malconduct. [¶] (b) That the person who has been declared elected to an office was not, at the time of the election, eligible to that office. [¶] (c) That the defendant has given to any elector or member of a precinct board any bribe or reward, or has offered any bribe or reward for the purpose of procuring his election, or has committed any other offense against the elective franchise defined in Division 17 (commencing with Section 29100). [¶] (d) That illegal votes were cast. [¶] (e) That the precinct board in conducting the election or in canvassing the returns, made errors sufficient to change the result of the election as to any person who has been declared elected. [¶] (f) That there was an error in the vote—counting programs or summation of ballot counts."

Trial lasted five days, during which numerous witnesses testified and various documents were admitted into evidence. In addition to the findings of fact set forth above, the trial court made further findings concerning evidence of fraud and tampering, and other violations against the elective franchise, respecting ballots that were ultimately disqualified by clerk's challenge. These included, among others:

That the testimony of one elector of the West Fresno/Washington Union School Districts established she had not signed the absentee ballot application, nor the envelope for the ballot, which had been sent to one of the BAPAC addresses and returned to the clerk with signatures purporting to be hers. Another elector of those districts testified through an interpreter that a person came to his home, urged him to "sign for the schools," and further advised him it was all right for his daughter to sign the absentee ballot application for him. The clerk's record established the ballot had been processed through BAPAC's VEP.

That the testimony of an elector from the Orange Center/Washington Union School Districts established three people came to his home late one night, "told him for whom to vote," and were emphatic that he not seal his ballot. They returned when only his wife was home and, discovering he had not signed the ballot, instructed her to sign her husband's name for him. This ballot was shown to have been processed through BAPAC.

That testimony of an elector of the West Park/Washington Union School Districts established he never completed an application for an absentee ballot, but recalled someone coming to his door requesting he sign a petition for a free breakfast program. Election records showed an absentee ballot had thereafter been mailed, ostensibly on his behalf, to a BAPAC address.

That testimony of an elector of the West Fresno/Washington Union School Districts established candidate Mary Bess and Leroy Brown brought an absentee ballot to the elector's home, and that Brown completed her ballot for her. The witness denied she had either consented to this procedure, instructed Brown to vote her ballot, or been consulted by Brown concerning the choices made on her ballot.[4]

The trial court's written findings further noted the testimony of the manager of a local copy shop. BAPAC representatives had requested his

---

[4] Although the Court of Appeal focused on the illegal votes cast and the extent to which they impacted on the election results (§§ 20021, subd, (d), 20024), we note that various Elections Code violations were arguably established on this record.

Section 29473 provides that: "(a) No candidate or representative of a candidate, and no proponent, opponent, or representative of a proponent or opponent, of an initiative, referendum, or recall measure, or of a charter amendment, shall solicit the vote of an absentee voter, or do any electioneering, while in the residence or in the immediate presence of the voter, and

shop to reproduce a large number of what were purportedly sample ballots; he in turn informed them he could not print the document, suggesting they instead "contact the State of California."[5]

The trial court concluded BAPAC was in fact "an admitted political organization," that through the auspices of the VEP it had assisted defendant-candidates in their campaigns by providing and distributing materials and furnishing access to information concerning voters, and that "[t]his assistance was not provided all candidates and would have been denied certain candidates even if requested. In this manner, BAPAC assisted in the election of defendants to non-political offices."

In addition to the certified election results reported above (*ante*, at p. 270), the following statistical facts, among others, regarding the illegal absentee ballots that were counted, and those which were disqualified by clerk's challenge, were established from official election records and other testimony and evidence adduced at trial:

The Fresno County Clerk Elections Department mailed a total of 1,292 absentee ballots to the BAPAC addresses. Of those, *269 were never returned to the elections department in any form*, and BAPAC was unable to account with any degree of reliability for the disposition of those 269 nonreturned ballots.

---

during the time he or she knows the absentee voter is voting." The statute makes knowing violations of its provisions a misdemeanor.

Section 29505 provides that: "Any individual, group, or organization which knowingly distributes any application for an absent voter's ballot which does not conform to the requirements of [the Elections Code provisions prescribing the form for, and rules governing, such absentee ballot applications] is guilty of a misdemeanor."

Section 29653 makes it a felony to: "furnish[ ] any voter wishing to vote, who cannot read, with a ballot, informing or giving that voter to understand that it contains a name written or printed thereon different from the name which is written or printed thereon, or defrauds any voter at any election by deceiving and causing him to vote for a different person for any office other than he intended or desired to vote for."

Section 29658 provides that: "Any person who applies for, or who votes or attempts to vote, an absent voter's ballot by fraudulently signing the name of a fictitious person, or of a regularly qualified voter, or of a person who is not qualified to vote, is guilty of a felony . . . ."

Each of the aforesaid provisions of law was in full force and effect at the time of the consolidated elections herein concerned. Each constitutes an "offense against the elective franchise defined in Division 17" of the Elections Code, violations of which themselves can furnish independent statutory grounds for contesting and annulling the election, separate and apart from the effects of any illegal votes actually counted. (§ 20021, subd. (c); see *Stebbins* v. *White* (1987) 190 Cal.App.3d 769, 788-791 [235 Cal.Rptr. 656].)

[5]The printing or duplication of simulated or sample ballots is strictly proscribed by statute, violations of which may be punishable as a misdemeanor. (§ 29414.)

Of the remaining 1,023 absentee ballots that were sent to BAPAC and returned to the elections department, 93 were disqualified by clerk's challenge, 63 of those on the basis of invalid signatures. Based on the advice of county counsel and the office of the Secretary of State, the remaining 930 absentee ballots were removed from their envelopes and counted. As explained below, all 930 ballots were illegal. It is now impossible to distinguish these 930 illegal absentee ballots from the remaining valid ballots cast in the consolidated elections.

The percentages of illegal ballots cast in each of the school district contests (obtained by dividing the number of illegal-but-counted BAPAC ballots by the total number of ballots counted in each district) were as follows: Orange Center Elementary, 70/173 = 40 percent; Pacific Union Elementary, 310/632 = 49 percent; West Fresno Elementary, 369/509 = 72 percent; West Park Elementary, 76/176 = 43 percent; and Washington Union High School, 930/2224 = 42 percent.

The trial court determined there had been fraud and tampering with respect to the 93 ballots disqualified by clerk's challenge. It further found the remaining 930 absentee ballots from BAPAC were cast in violation of sections 1006 (address to which ballot is to be mailed must be "personally affixed" by voter and may not be a political campaign headquarters) and 1013 (requiring absentee voter to personally mail or return ballot to official from whom it came or precinct board at any polling place), were therefore illegal, and could not be counted. It recognized it could not determine with certainty how the illegal ballots were cast, and thus could not deduct the illegal votes from the defendants to see who received a majority of lawful votes for each office. (§§ 20024, 20087.) But the court, "after careful consideration of the competing factors," including "the wholesale violation of the mandatory requirements of the absentee voting laws in this case," concluded the evidence showed the great majority of illegal-but-counted BAPAC ballots were voted for the defendants, and had been sufficient to affect the election of many of them. It annulled the consolidated elections pursuant to section 20086,[6] and ordered new elections held forthwith, concluding "[a]nything less, under these facts, would result in a loss of public respect for and diminution of the integrity of the absentee ballot process" and would "tend to encourage even greater abuse of the process in future elections."

---

[6]Section 20086 states:

"The court shall continue in special session to hear and determine all issues arising in contested elections. After hearing the proofs and allegations of the parties and within 10 days after the submission thereof, the court shall file its findings of fact and conclusions of law, and immediately thereafter shall pronounce judgment . . . either confirming or annulling and setting aside the election. The judgment shall be entered immediately thereafter."

The Court of Appeal found substantial evidence supported the trial court's factual findings regarding the illegal ballots. It nonetheless concluded the results of the consolidated elections could not be set aside because it could not be determined for whom the illegal ballots were cast. The court focused on the command of section 20024, which states: "An election shall not be set aside on account of illegal votes, unless it appears that a number of illegal votes has been given to the person whose right to the office is contested or who has been certified as having tied for first place, which, if taken from him, would reduce the number of his legal votes below the number of votes given to some other person for the same office, after deducting therefrom the illegal votes which may be shown to have been given to that other person."

The Court of Appeal reasoned, "Even assuming in these circumstances it could be calculated how many votes were cast on each illegal ballot, in what district they were cast and in what proportion they were cast, any attempt to apportion pro rata must still meet the test of section 20024. [¶] It would be futile for this court to remand for further findings. It is clear from the findings and the record before us it would be impossible to find, by clear and convincing evidence, that the illegal votes were cast for the contestees in this case. [¶] Indeed, it is obvious to this court it would be impossible in any multi-issue or multi-candidate primary or general election to determine the effect of illegal voting of the type and extent at issue here. Once illegal ballots are cast and commingled with the legal ballots, they cannot be traced to reveal for whom they were cast."

The irony of this conclusion was not lost on the Court of Appeal, which concluded: "The violations of election laws pertaining to absentee balloting in this case were pervasive and significant, yet the very nature and extent of the illegal voting renders any remedy illusory. The court is constrained by the statutory limitation on the authority to annul and set aside the election based upon illegal votes."

## II. DISCUSSION

### A. *Standard of Review*

Strict rules embodied in the Elections Code govern a court's review of a properly contested election. ▮ " 'It is a primary principle of law as applied to election contests that it is the duty of the court to validate the election if possible. That is to say, the election must be held valid unless plainly illegal. [Citations.]' " (*Wilks* v. *Mouton* (1986) 42 Cal.3d 400, 404 [229 Cal.Rptr. 1, 722 P.2d 187], quoting *Rideout* v. *City of Los Angeles* (1921) 185 Cal. 426, 430 [197 P. 74].) There is an express legislative policy requiring liberal construction of absentee ballot provisions in favor of the absentee voter. (§ 1001; *Wilks* v. *Mouton, supra,* 42 Cal.3d at p. 404.)

Of competing importance, however, is the principle that, "preservation of the integrity of the election process is far more important in the long run than the resolution of any one particular election." (*Fair* v. *Hernandez* (1981) 116 Cal.App.3d 868, 881 [172 Cal.Rptr. 379].) To this end, we have observed that, "The policy in favor of upholding elections appears in the cases in conjunction with the rule that '[t]echnical errors or irregularities arising in carrying out directory provisions *which do not affect the result* will not [void] the election.' (*Davis* v. *County of Los Angeles* [(1938)] 12 Cal.2d [412,] 426 [84 P.2d 1034] (italics added); *Rideout* v. *City of Los Angeles, supra,* 185 Cal. at p. 430; *People* v. *Prewett* [(1899)] 124 Cal. [7,] 10 [56 P. 619].) Both the policy and the rule manifest the fact that '[c]ourts are reluctant to defeat the fair expression of popular will in elections. . . .' (*Simpson* v. *City of Los Angeles* [(1953)] 40 Cal.2d [271,] 277 [253 P.2d 464]); neither has been invoked to uphold an election in the face of illegalities which affected the result—a situation in which the will of the people may be thwarted by upholding an election." (*Canales* v. *City of Alviso* (1970) 3 Cal.3d 118, 127 [89 Cal.Rptr. 601, 474 P.2d 417].)[7]

██ " 'The scope of review in an election contest is not different from other cases. Where the evidence is in conflict, [the appellate court] will defer to the trial court where events at trial and demeanor of the witnesses play an important part in the decision.' " (*Escalante* v. *City of Hermosa Beach* (1987)

---

[7]In *Rideout* v. *City of Los Angeles, supra,* 185 Cal. 426, this court stated, "[A] distinction has been developed between mandatory and directory provisions in election laws; *a violation of a mandatory provision vitiates the election,* whereas a departure from a directory provision does not render the election void if there is a substantial observance of the law and no showing that the result of the election has been changed or the rights of the voters injuriously affected by the deviation. [Citations.]" (185 Cal. at p. 430, italics added.)

Although the distinction between "mandatory" and "directory" provisions in the election laws remains an important one today, the above underscored passage cannot be read for the proposition that every violation of a mandatory provision in the Elections Code will "vitiate"—i.e., invalidate or annul—the results of a contested election. In *Rideout* we explained that, "If the act enjoined goes to the substance or necessarily affects the merits or results of the election, it is mandatory; otherwise directory. [Citations.]" (*Rideout* v. *City of Los Angeles, supra,* 185 Cal. at p. 431.) The modern Elections Code provisions, which postdate *Rideout,* in many instances explicitly state whether they are "mandatory" or "directory," and set forth the legislatively intended effect of such characterization.

For example, section 1013, which prescribes the manner in which absentee ballots are to be returned to election officials, states: "The provisions of this section are mandatory, not directory, *and no ballot shall be counted if it is not delivered in compliance with this section.*" (Italics added.) Hence, a violation of this "mandatory" provision results in disqualification of the ballot. The court's jurisdiction to confirm or annul the results of an election based upon one or more such violations is more broadly governed by sections 20021 (*ante,* at p. 273, fn. 3) (setting forth the statutory grounds for elections contests), 20086 (vesting the court with authority to pronounce judgment confirming or annulling an election), 20024 (authorizing the setting aside of an election where it appears illegal votes affected its outcome) and 20087 (authorizing the court to declare another person the winner of an election where it can be established such person has the highest number of legal votes).

195 Cal.App.3d 1009, 1014 [241 Cal.Rptr. 199], quoting *Fair* v. *Hernandez*, *supra*, 116 Cal.App.3d at p. 874; see also *Hardeman* v. *Thomas* (1989) 208 Cal.App.3d 153, 166 [256 Cal.Rptr. 158].) "The contestant has the burden of proving the defect in the election by clear and convincing evidence. (*Smith* v. *Thomas* (1898) 121 Cal. 533, 536 [54 P. 71]; *Hawkins* v. *Sanguinetti* (1950) 98 Cal.App.2d 278, 283 [220 P.2d 58]; *Wilburn* v. *Wixson* [(1974)] 37 Cal.App.3d [730,] 737 [112 Cal.Rptr. 620].)" (*Wilks* v. *Mouton, supra*, 42 Cal.3d at p. 404.) "[W]e must consider the evidence in the light most favorable to the prevailing party, giving such party the benefit of every reasonable inference, and resolving all conflicts in support of the judgment. [Citation.]" (*Wilks* v. *Mouton, supra*, 42 Cal.3d at p. 408, fn. 7.) And "[w]e are . . . bound by the trial court's determination of the facts except to the extent that they are not supported by substantial evidence. (*Wilburn* v. *Wixson, supra*, 37 Cal.App.3d 730, 737; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289.)" (*Wilks* v. *Mouton, supra*, 42 Cal.3d at p. 404.)

## B. *Section 1013*

 Illegal votes are votes which have not been cast in the manner provided by law. (*Bush* v. *Head* (1908) 154 Cal. 277, 281-282 [97 P. 512].) Illegal votes include votes by persons receiving their absentee ballots in a manner that violates election laws governing absentee balloting. (*Hardeman* v. *Thomas, supra*, 208 Cal.App.3d 153, at p. 168.)

As noted above, the Court of Appeal concluded that substantial evidence supported the trial court's finding that counting the 930 absentee ballots violated the mandatory provisions of section 1013. We agree. Section 1013 provides, in pertinent part:

"All absentee ballots cast . . . shall be voted on or before the day of the election. After marking the ballot, the absent voter shall either: (1) return the ballot by mail or in person to the official from whom it came or (2) return the ballot in person to any member of a precinct board at any polling place within the jurisdiction. However, an absent voter who, because of illness or other physical disability, is unable to return the ballot, may designate his or her spouse, child, parent, grandparent, grandchild, brother, or sister to return the ballot to the official from whom it came or to the precinct board at any polling place within the jurisdiction. [¶] . . . [¶] The provisions of this section are mandatory, not directory, and no ballot shall be counted if it is not delivered in compliance with this section."[8]

 In the present case, the 930 absentee ballots at issue were collected from the absentee voters by BAPAC and returned to the county clerk by

---

[8]The Legislature amended section 1013 in response to *Wilks* v. *Mouton, supra*, 42 Cal.3d 400, which had held that the provisions of section 1013 were directory, not mandatory. The

BAPAC, a clear violation of section 1013. The fact that BAPAC may have been given permission by the absentee voters to return the ballots on behalf of them does not satisfy section 1013; in such instance the voter has not delivered the ballot to the official from whom it came or to a precinct board either personally, directly to such official by mail, or by one of the family members designated in the statute as authorized to hand-deliver the ballot when the voter is unable to do so because of illness or other physical disability.[9]

Accordingly, the 930 ballots delivered in violation of section 1013 are clearly illegal and cannot be counted. (*Rideout* v. *City of Los Angeles, supra,* 185 Cal. at p. 430; *Escalante* v. *City of Hermosa Beach, supra,* 195 Cal.App.3d 1009 [absentee referendum ballot returned by third party to city clerk's office at absentee voter's request, could not be counted]; *Fair* v. *Hernandez* (1982) 138 Cal.App.3d 578 [188 Cal.Rptr. 45] [ballots must be returned personally by voter without use of another person or agent].)

## C. *Section 1006*

An application for an absentee ballot must provide a space for the address to which the ballot is to be sent. (§ 1006, subd. (a)(2).) Section 1006, subdivision (b)(1) requires that this information "shall be personally affixed by the voter." Section 1006, subdivision (b)(2) prohibits an applicant from entering the address of a political campaign headquarters as the address to which the absentee ballot is to be sent.

---

Legislature specifically announced that its purpose in amending section 1013 was "to clarify potential ambiguity in *Wilks* v. *Mouton,* and to declare that its intent 'is and always has been' that section 1013 be given mandatory effect." (*Escalante* v. *City of Hermosa Beach, supra,* 195 Cal.App.3d at p. 1020; Stats. 1987, ch. 22, § 1, pp. 59-60.)

[9]Our interpretation of section 1013 is not governed by the holdings pertaining to that statute in *Wilks* v. *Mouton, supra,* 42 Cal.3d at pages 410-412, and *Beatie* v. *Davila* (1982) 132 Cal.App.3d 424, 429 [183 Cal.Rptr. 179]—viz., that third parties may mail or deliver completed absentee ballots to election officials on behalf of the absentee voter—because those cases construed section 1013 prior to its amendment in 1987. (See *ante,* at pp. 279-280, fn. 8.) Although the language of *former* section 1013 was susceptible of an interpretation that third parties could return completed absentee ballots to election officials on behalf of an absentee voter, the amended statutory language precludes any such construction now. (Cf. Stats. 1976, ch. 1275, § 18, *with* Stats. 1987, ch. 22, § 2.) If the current version of section 1013 were to be construed to permit any absentee voter to hand his or her completed ballot to any third party for mailing or delivery to election officials, then the language expressly authorizing ill or physically disabled absentee voters to enlist the assistance of certain specified close family members in returning their completed absentee ballots to the election officials would be rendered superfluous. Section 1013 in effect specifies the method that will best protect against any tampering with, or nondelivery of, the absentee ballot: the voter may either personally deliver or mail the ballot, or, in the case of "illness or other physical disability," direct a close family member to return the completed ballot.

The trial court found that in the majority of cases, the VEP "solicitor" filled in the information regarding the address to which the absentee ballot was to be sent for the voter, and that the address provided was that of BAPAC. Defendants do not challenge the sufficiency of the evidence to support these findings. The trial court also found that BAPAC was engaged in a political campaign through the VEP to defeat the incumbents in the consolidated elections, and that entering BAPAC's address as the address to which the ballot was to be sent violated section 1006, subdivision (b)(2). ▪ This finding, too, is supported by substantial evidence. In his 1991 report to the BAPAC statewide convention, Fresno Chapter President Mel Sanders indicated BAPAC's VEP "has targeted 13 seats of several of the smaller school district boards that serve the southwest urban area of metropolitan Fresno," and that "The central strategy in the election involves a highly selective process of both voter registration and absentee ballot applications. . . . [W]e are projecting a landslide in seven of the elections and comfortable wins in the others."

Section 1006 is silent as to whether its provisions are mandatory or directory. As the Court of Appeal properly concluded, however, the point need not be decided in this case; the 930 BAPAC ballots were cast in violation of the mandatory provisions of section 1013, thereby rendering those ballots illegal.

D. *The Remedy*

As explained above, it is presently impossible to distinguish the 930 illegal BAPAC absentee ballots from the remaining valid ballots cast in the consolidated elections. Thus, it cannot now be determined with mathematical certainty how the illegal votes on the illegal ballots were cast. The trial court recognized it could not deduct the illegal votes from the defendants to see who received a majority of lawful votes for each office. (§§ 20024, 20087.)

The trial court nevertheless concluded, "in light of the wholesale violation" of the absentee voting laws in this case—including (i) the section 1013 and section 1006 violations, (ii) the improper involvement of BAPAC "solicitors" and candidates themselves in soliciting absentee votes (at least 4 of the 12 defendant-candidates were members of BAPAC; 11 of the 12 had been given BAPAC absentee ballots for delivery to the voters), (iii) BAPAC's inability to account for 269 mailed absentee ballots which were never returned to the elections department in any form, and (iv) the fraud, tampering, and overreaching established with respect to the 93 ballots disqualified by clerk's challenge—that the evidence showed the great majority of illegal-but-counted BAPAC ballots were voted for the defendant-candidates, and were sufficient to affect the election of many of them. The

trial court therefore annulled the consolidated election results and ordered new elections.

In reversing that order, the Court of Appeal concluded that, "[e]ven assuming in these circumstances it could be calculated how many votes were cast on each illegal ballot, in what district they were cast and in what proportion they were cast, any attempt to apportion pro rata must still meet the test of section 20024." The court further stated its opinion that "it would be impossible in any multi-issue or multi-candidate primary or general election to determine the effect of illegal voting of the type and extent at issue here."

Section 20024 provides, "An election shall not be set aside on account of illegal votes, unless *it appears* that a number of illegal votes has been given to the person whose right to the office is contested or who has been certified as having tied for first place, which, if taken from him, would reduce the number of his legal votes below the number of votes given to some other person for the same office, after deducting therefrom the illegal votes which may be shown to have been given to that other person." (Italics added.)

■ The Court of Appeal's construction of the language of section 20024 fails to heed the fundamental premise that a court must not "sacrifice the integrity of the [elective] process on the altar of electoral finality." (*Hardeman* v. *Thomas, supra,* 208 Cal.App.3d at p. 167.) We do not believe the Legislature intended that under circumstances such as these, where clear and convincing evidence established pervasive illegalities that permeated the election process, and where, although it cannot be determined on a vote-by-vote basis for whom the illegal votes were cast, it nonetheless "appears" the illegal votes affected the outcome of the election, a trial court is without authority to annul and set aside the election results within its discretion under section 20086.

■ Fundamentally, the objective of statutory interpretation is to ascertain and effectuate legislative intent. (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154]; *People* v. *Overstreet* (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288].) In determining intent, we look first to the words of the statute themselves. (*Woodhead, supra,* 43 Cal.3d at p. 1007; *Overstreet, supra,* 42 Cal.3d at p. 895; *People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 40 [127 Cal.Rptr. 122, 544 P.2d 1322].)

■ Section 20024 states an election shall not be set aside on account of illegal votes unless "it appears" a number of illegal votes were given to the

election winner. In utilizing the phrase "it appears," we think the Legislature contemplated circumstances, such as those at hand, in which illegal votes cannot be attributed to any one candidate, but nevertheless "appear" sufficient in number or effect to have altered the outcome of the election. In contrast, the Court of Appeal's construction of section 20024 reads the phrase "it appears" right out of the statutory language.

Likewise, section 20052, enacted at the same time as section 20024, which sets forth the pleading requirements for election contests based on illegal votes pursuant to section 20021, subdivision (d), provides that, "When the reception of illegal votes is alleged as a cause of contest, *it is sufficient to state generally* that in one or more specified voting precincts illegal votes were given to the defendant, which, if taken from him, will reduce the number of his legal votes below the number of legal votes given to some other person for the same office." (Italics added; see Stats. 1961, ch. 23, § 3, p. 834.)

Our interpretation of section 20024 is further supported by our decision in *Canales* v. *City of Alviso, supra,* 3 Cal.3d 118. In *Canales,* several electors of the City of Alviso brought an action to contest an election held to determine whether that city should be consolidated with the City of San Jose. The electors complained that the vote to consolidate passed only because (i) the election board committed various acts of misconduct under section 20021, (ii) Alvisans were thereby induced to vote in favor of consolidation, and (iii) several illegal votes were cast for consolidation.

During trial on the contest, several votes were disqualified because the voters were nonresidents, or because city officials made illegal offers of consideration to prospective voters, including promises of improved city services in the event consolidation passed. These promises were in the form of contracts between the City of San Jose and the Alviso Improvement Corporation, an organization with close ties to the San Jose City Manager's office. The election results were 189 votes in favor of and 180 votes opposed to consolidation. (*Canales* v. *City of Alviso, supra,* 3 Cal.3d at pp. 123-124.) Thereafter, 21 votes were challenged by the contestants.

The trial court upheld the election after finding that "of the 21 challenged voters, 10 were disqualified by nonresidence in Alviso and one by virtue of a felony conviction; that of these 11 illegal votes, one was cast for and one against consolidation." (*Canales* v. *City of Alviso, supra,* 3 Cal.3d at p. 125.) The court could not, however, determine how the remaining nine illegal votes were cast. It therefore concluded the remaining nine votes should be apportioned by "tak[ing] half from each side—leaving a final tally of 183½

votes in favor and 174½ votes opposed to consolidation." (*Ibid.*) Based on this conclusion, the trial court confirmed the election results.

In reversing the judgment, we acknowledged that section 20024 requires a showing that "illegal votes were sufficient in number to account for the result but also that illegal votes were cast in such a manner as in fact to determine the result." (*Canales* v. *City of Alviso, supra,* 3 Cal.3d at p. 126.) Nonetheless, after noting that the only evidence as to how the remaining nine illegal votes were cast were the signatures of the voters on the "petition by virtue of which the election was held," we concluded such evidence, albeit circumstantial, was admissible on the question (citing *Robinson* v. *McAbee* (1923) 64 Cal.App. 709, 718 [222 P. 871]), that "[the] contestants met their burden as to the crucial nine votes," and that "in the absence of any contrary evidence, the trial court erred in refusing to so find." (*Canales, supra,* 3 Cal.3d at p. 126.)

We observed in *Canales* that, "[t]he policy in favor of upholding elections appears in the cases in conjunction with the rule that '[t]echnical errors or irregularities . . . *which do not affect the result* will not [void] the election.' [Citations.]" (*Canales* v. *City of Alviso, supra,* 3 Cal.3d at p. 127; see discussion *ante,* at p. 278.) We further recognized that "neither [the policy nor the rule] has been invoked to uphold an election in the face of illegalities which affected the result—a situation in which the will of the people may be thwarted by upholding an election." (*Ibid.*)

We rejected the respondents' claim that the election contestants' evidentiary showing, which was largely circumstantial (illegal voters had signed a petition to put the consolidation measure on the ballot), was insufficient to establish that the election had in fact been affected by the illegal votes. Opining that "a voter's signature on a petition urging that an issue be put on the ballot so that a certain result may be obtained is circumstantial evidence which is admissible to show that he in fact voted in favor of that result [Citation]," we concluded that the "[r]espondents had the same . . . opportunity to ask voters how they voted, but did not cross-examine the witnesses who testified that they signed the petition or favored consolidation to attempt to rebut [contestants'] circumstantial showing that the witnesses voted in accord with their signatures on the petition. [¶] Although an elector who signed the petition may subsequently have changed his mind, respondents made no effort to show that this ever occurred in fact. As a result the record clearly contains substantial evidence tending to show that all nine illegal votes were cast in favor of consolidation, and absolutely no evidence to the contrary. Accordingly, this judgment [confirming the election] must be reversed for lack of any evidentiary support. [Citation.]" (*Canales* v. *City of Alviso, supra,* 3 Cal.3d at p. 128.)

We are of the opinion that here, the election contestants made a much stronger circumstantial evidentiary showing that illegal votes affected the outcome of these consolidated elections than was made in *Canales, supra,* 3 Cal.3d 118. The widespread illegal voting practices that permeated this election—including fraud and tampering, the clearly established violations of sections 1006 and 1013, BAPAC's "loss" of 269 absentee ballots mailed to it by the Fresno County Clerk, the fact that nearly all of the candidates themselves, knowingly or otherwise, took part in the malconduct of "soliciting" absentee votes in violation of specific Elections Code provisions, the large percentages (40 percent to 72 percent) of illegal BAPAC absentee ballots cast and counted in each election, and the fact that all BAPAC-supported candidates won handily in each and every one of the election contests—together furnished sufficient, essentially uncontroverted circumstantial evidence in support of the conclusion that "it appear[ed]" the illegal votes affected the outcomes of the consolidated elections. (§ 20024.)[10]

### III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the Court of Appeal.

Mosk, J., Panelli, J., Arabian, J., Baxter, J., and George, J., concurred.

**KENNARD, J., Dissenting.**—In this case, plaintiffs, unsuccessful candidates for school board positions in five school districts in Fresno County, seek to set aside the election of their opponents on the ground that "illegal votes were cast." (Elec. Code, § 20021, subd. (d).)[1] A large number of illegal votes were cast in the elections for each of the five school districts, and, if all of those votes were cast for the successful candidates, the outcome of each of the elections would be affected. But the evidence plaintiffs introduced in support of their challenge to the election does not show for whom the illegal ballots were cast. The majority nonetheless concludes that the election should be set aside.

I disagree. In my view, the law permits an election to be set aside because of illegal votes only if the person challenging the election can show that a

---

[10]In light of our conclusion that there is substantial, uncontroverted evidence that illegal absentee ballot voting appears to have affected the results of these consolidated elections within the meaning of sections 20021, subdivision (d) and 20024, we need not and do not determine whether the trial court's findings of fact and conclusions of law, and its judgment annulling and setting aside the consolidated elections, agreed with contestants' further claim, pleaded in the complaint, that evidence of "other offense[s] against the elective franchise" (§ 20021, subd. (c)) furnished a separate and independent basis for annulling the election results. (See *ante,* at pp. 274-275, and fn. 4.)

[1]Unless otherwise stated, all subsequent statutory references are to this code.

large enough number of illegal votes were cast for the winning candidate(s) so that, if the illegal votes for both the winning and the losing candidates were set aside and the remaining votes were tabulated, the outcome of the election would be different. Here, plaintiffs have not made such a showing, and the majority's conclusion that the election should be invalidated because of illegal votes is therefore erroneous. But, as I shall explain, plaintiffs may be entitled to prevail on the ground that the successful candidates engaged in "offense(s) against the elective franchise." (§ 20021, subd. (c).) I would direct the Court of Appeal to remand the matter to the trial court with directions to determine whether such a violation occurred.

## I

Insofar as I can determine from the skimpy record furnished to this court,[2] the relevant facts are these: In November 1991, elections were held in Fresno County for positions on the boards of one high school and four elementary school districts. Either two or three positions were vacant on each of the various boards, so voters were entitled to vote for more than one candidate. The losing candidates (plaintiffs) challenged the results of the election.

Plaintiffs' challenge was directed primarily to the activities of the Voter Education Project (VEP), an organization created by the Fresno Chapter of the Black American Political Association of California (BAPAC). Although BAPAC did not endorse candidates in the elections, four of the winning candidates were BAPAC members, and the referee found that BAPAC had "assisted" the winning candidates by "providing and distributing materials and access to information concerning voters."

Before the election, VEP workers visited potential voters in their homes and urged them to sign registration affidavits and to apply for absentee ballots. The VEP workers encouraged these potential voters to agree to have their ballots hand-delivered to them by BAPAC; in most cases, VEP workers filled in BAPAC's address as the place to which the ballots were to be mailed.

The absentee ballots that were mailed to BAPAC were then brought to voters' homes by VEP workers, BAPAC members, and candidates in the

---

[2]This appeal should arguably have been dismissed because of the inadequacy of the appellate record. (See *Kearl* v. *Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040, 1051 [236 Cal.Rptr. 526]; but see Cal. Rules of Court, rule 52.) As the Court of Appeal noted: "The reporter's transcript contains selected excerpts from the testimony of three out of approximately twenty-five witnesses. We have only a few of what appears to be approximately 60 exhibits." Nevertheless, neither the Court of Appeal nor the majority found the record to be inadequate. Accordingly, I shall attempt to analyze the issues on the limited record available.

school board elections. The voters were encouraged to vote in the presence of the persons who had delivered the ballots; in some cases, those persons gave information regarding candidates or issues. After voting, the voters placed their ballots in envelopes, signed and dated the envelopes, and gave them to the persons who had hand-delivered the ballots. These persons then took the ballots to BAPAC headquarters, from which they were mailed to the Fresno County Elections Department.

As the majority explains, the manner in which the VEP workers provided the ballots to the voters and the mode of casting the ballots violated the absentee voting requirements of sections 1006 and 1013. Under those statutes, BAPAC's address should not have been used as the place to which the absentee ballots were sent, and voters who chose to return their absentee ballots by mail should have personally mailed the ballots instead of giving them to the persons who brought the ballots to their homes. (Maj. opn., *ante*, pp. 279-281.) As a result, the ballots so cast were illegal, and should not have been counted.

BAPAC mailed 1,023 absentee ballots to the county elections department. Of these, 93 ballots were disqualified. The elections department removed the remaining 930 from their envelopes, commingled them with the other ballots cast in the election, and counted them. As a result, 930 illegal ballots were tabulated in the high school district election, and smaller numbers of illegal ballots were tabulated in the elections for the elementary school districts.

## II

Before considering whether, and on what basis, plaintiffs' challenge to the school board elections should be upheld, it is important to distinguish an election challenge brought on the ground of "illegal votes" under section 20021, subdivision (d) (hereafter section 20021(d)), from a challenge under section 20021, subdivision (c) (hereafter section 20021(c)), brought on the ground that the challenged candidate has committed an offense against the elective franchise.[3]

An "illegal" vote is simply a ballot cast in violation of the procedures established by the Elections Code. A ballot may be illegally cast even

---

[3]As relevant, section 20021 provides: "Any elector of a county, city, or of any political subdivision of either may contest any election held therein, for any of the following causes:

". . . . . . . . . . . . . . . . . . . . . . . .

"(c) That the defendant has given to any elector or any member of a precinct board any bribe or reward, or has offered any bribe or reward for the purpose of procuring his election, or has committed any other offense against the elective franchise defined in Division 17 (commencing with Section 21900).

"(d) That illegal votes were cast."

though the voter, or the persons assisting the voter, did not intend to subvert the elections process. Thus a well-meaning voter may cast an illegal vote through ignorance or inadvertence rather than a conscious attempt to circumvent elections laws or to give any candidate an unfair advantage. Assume, for example, that a major civic organization such as the League of Women Voters, in a well-intended but misguided attempt to increase voter turnout, agreed to mail in the absentee ballots of a number of voters. The ballots mailed in this fashion would be "illegal," even though neither the League of Women Voters nor the voters themselves intended to undermine the electoral process.

If a trial court finds that the number of illegal votes cast for a winning candidate is so great that, when those votes are subtracted from the candidate's total, that candidate no longer has a plurality of the votes legally cast, the court must not only set aside the election (§ 20024), but it must also declare as the winner the candidate who received the plurality of the legally cast votes. (§ 20087.) In that situation, the result will be the election of a candidate who did not enjoy the support of a plurality of the people who cast ballots, because some of the persons voting for the candidate who received the most votes did not cast their votes in the statutorily approved manner.

Because a successful election challenge based on illegal votes may thus lead to the election of a candidate receiving a minority of the votes cast (but a plurality of the *legally* cast ballots), the Legislature has stated that absentee ballot provisions "shall be liberally construed in favor of the absent voter" (§ 1001) and this court has said that "[e]ven mandatory provisions [of the election laws] must be liberally construed to avoid thwarting the fair expression of popular will." (*Wilks* v. *Mouton* (1986) 42 Cal.3d 400, 404 [229 Cal.Rptr. 1, 722 P.2d 187].) To prevail, a contestant must show a defect in the election by "clear and convincing evidence." (*Ibid.*; see also *Smith* v. *Thomas* (1898) 121 Cal. 533, 536 [54 P. 71].)

When, by contrast, a challenge is based on offenses against the elective franchise under section 20021(c), the issue for the trial court is not whether individual votes were improperly cast; rather, the issue is whether the prevailing candidate has committed any one of a number of criminal acts proscribed by the Elections Code.

Here, plaintiffs' challenge to the election was twofold: illegally cast votes under section 20021(d), and the candidates' commission of offenses against the elective franchise under section 20021(c). Because the trial court ordered a new election on the ground that illegal votes were cast, it did not resolve plaintiffs' challenge under section 20021(c). The majority upholds the trial court's ruling. I do not agree, as I shall explain.

# III

A challenge to an election based on illegally cast votes must satisfy the evidentiary burden imposed by section 20024. That statute provides: "An election shall not be set aside on account of illegal votes, unless it appears that a number of illegal votes has been given to the person whose right to the office is contested or who has been certified as having tied for first place, which, if taken from him, would reduce the number of his legal votes below the number of votes given to some other person for the same office, after deducting therefrom the illegal votes which may be shown to have been given to that other person."

In other words, under section 20024 an election challenge on the basis of illegal votes may be sustained only if the challenger shows "not only that illegal votes were sufficient in number to account for the result but also that illegal votes were cast in such a manner as *in fact* to determine the result." (*Canales* v. *City of Alviso* (1970) 3 Cal.3d 118, 126 [89 Cal.Rptr. 601, 474 P.2d 417], italics added.) The trial court may not simply assume that all illegal votes were cast for the prevailing candidate; rather, the challenging party must present evidence showing how the illegal votes were cast.

In this case, plaintiffs presented virtually no evidence of how the 930 illegal ballots BAPAC submitted to the county elections department were cast. According to the trial court's findings of fact, two voters testified that the VEP worker who brought them their absentee ballots assisted them in voting; their ballots, however, were among the ninety-three ballots that were disqualified by the county elections department and not counted. One voter testified that the VEP workers told him for whom to vote; his vote was counted by the elections department. Two other persons testified that they had not voted, although the records of the elections department showed that ballots had been submitted on their behalf. The elections department disqualified both of these ballots. The trial court's findings of fact contain no other evidence of the manner in which individual voters cast their ballots.

Plaintiffs could have called as witnesses each of the persons who had submitted illegal ballots, or, more realistically, a representative sample of those persons, and asked them how they voted.[4] Alternatively, plaintiffs could have used other circumstantial evidence to show for whom the individuals cast their illegal votes. (See *Canales* v. *City of Alviso, supra,* 3 Cal.3d

---

[4]The general rule that ballots must be kept secret (Cal. Const., art. II, § 7) does not apply to illegally cast votes. "[T]he rule is that one who votes illegally forfeits the privilege of secrecy." (*Singletary* v. *Kelley* (1966) 242 Cal.App.2d 611, 613 [51 Cal.Rptr. 682]; see also *Patterson* v. *Hanley* (1902) 136 Cal. 265, 276 [68 P. 821 [68 P. 975]; 28 Cal.Jur.3d (rev.), Elections, § 251, Testimony as to How Voter Voted, p. 759.) Thus, in this case the challengers could have called as witnesses the persons who had cast each of the 930 illegal ballots,

at pp. 127-128.) Because plaintiffs did not do so, they failed to discharge their burden, imposed by section 20024, of showing that the number of illegal votes actually cast for the prevailing candidate was so great that the outcome of the election was altered.

Plaintiffs' failure to satisfy the statutory burden can be readily shown by an examination of the election in one school district. In the Pacific Union School District, for example, two seats were contested. Elected were Lawrence Cato and Rosemary Garcia, who defeated Roland Lawrence, Delbert Cederquist, Tami Gandy, and Toni Nagai. The totals were: Cato—358; Garcia—316; Lawrence—189; Cederquist—175; Gandy—80; Nagai—70. There were 310 illegal ballots. Because Cato's margin of victory over his nearest unsuccessful challenger (Lawrence) was 169 votes, plaintiffs had to show that 169 *more* illegal votes were cast for Cato than were cast for Lawrence to overturn Cato's election under section 20024.

Because voters could vote for more than one candidate, ballots could be cast in four different ways: (1) voters could vote for neither Cato nor Lawrence, (2) they could vote for both of them, (3) they could vote for Cato but not Lawrence, and (4) they could vote for Lawrence but not Cato. Illegal votes in categories (1) and (2) would not affect the outcome of the election, because they would not alter Cato's margin of victory; illegal votes in category (3) would, if deducted from Cato's total, reduce his margin of victory, while illegal votes in category (4) would, if deducted from Lawrence's total, increase Cato's margin. Because the margin of victory was 169 votes, Cato's election would be affected only if plaintiffs could show that of the 310 illegally cast ballots, there were 169 more of them in category (3) than there were in category (4).

Plaintiffs offered no evidence showing how many of the illegal votes fell into each of the four categories I just described. Consequently, it is impossible to determine from the evidence presented whether Cato's election was affected by the illegally cast votes.

The trial court recognized the problem in its findings of fact and conclusions of law: "This court cannot determine with certainty how the illegal ballots were cast. Thus, it cannot deduct the illegal votes directly from a defendant to see if he or she received a majority of the lawful votes for the office. (§§ 20024, 20087.)" The court nevertheless concluded that, because of the "wholesale violation of the mandatory requirements of the absentee voting laws in this case," there should be a remedy to prevent "a loss of

and asked them how they cast their votes. (*Canales* v. *City of Alviso, supra*, 3 Cal.3d at p. 128.)

public respect for and diminution of the integrity of the absentee ballot process" and to deter "greater abuse of the process in future elections." Because the trial court was convinced that the illegal votes cast were sufficient to affect the election of "many" of the defendants, it invalidated the election of *all* of the candidates in each of the five school districts.

Although the trial court's concern to achieve a "just" result is understandable, it was not entitled to disregard the mandate of section 20024. As discussed earlier, that statute permits the court to set aside an election because of illegal votes only if the plaintiff has shown that enough illegal votes were cast for the winning candidate that, if the illegal votes for both the winning and losing candidates were set aside and the remaining votes were counted, the election's outcome would be affected. The trial court's finding that "many" of the elections were affected does not support its conclusion that the election of *all* the candidates should be set aside. Once the court found that the evidence was insufficient to permit it to subtract the illegal votes from the candidates' totals, it should have recognized that plaintiffs had not met their burden, imposed by section 20024, of presenting evidence that would enable the trial court to perform this task, and should thus have concluded that plaintiffs had not demonstrated that the illegal votes required the election to be set aside.

Nonetheless, the majority concludes that the trial court's ruling setting aside the election should be upheld. The majority's reasons for its conclusion are not convincing, as I shall explain.

Section 20024 states that an election shall not be set aside unless "it appears" that a subtraction of the illegally cast votes from each candidate would alter the outcome of the election; seizing upon the words "it appears," the majority concludes that the Legislature intended that an election be invalidated whenever "illegal votes cannot be attributed to any one candidate, but nevertheless 'appear' sufficient in number or effect to have altered the outcome of the election." (Maj. opn., *ante*, p. 283.)

I cannot agree with the majority's analysis. Section 20024's use of the word "appear" certainly indicates a legislative conclusion that the trial court need not determine with *absolute certainty* for whom the illegal votes were cast before it may invalidate the election; nevertheless, the trial court must still decide, based on evidence presented, how the votes were cast. Such evidence was not offered here. The majority accuses the Court of Appeal of reading the words "it appears" out of section 20024; the majority, however, uses those very words to obliterate the remainder of the statute, which requires the trial court to determine how many illegal votes were cast for each candidate, and to subtract those votes from their totals.

The majority also attempts to find support for its holding by relying on *Canales* v. *City of Alviso, supra,* 3 Cal.3d 118. This reliance is misplaced. In *Canales,* an election was held to determine whether the City of Alviso should be annexed by the City of San Jose. There were 189 votes cast in favor of consolidation and 180 against. The contestants challenged 21 votes as illegal; with respect to 9 of those votes, the contestants attempted to show how they were cast by producing evidence that the 9 voters had signed a petition to place the measure proposing consolidation on the ballot. Based on that evidence, this court concluded, the trial court should have found that those 9 voters had cast their votes in favor of consolidation.

Under *Canales,* a challenger claiming that an election was affected by illegal ballots need not rely on the ballots themselves or the voter's testimony as to how he or she voted in order to demonstrate how an illegal vote was cast. Instead, the challenger may use circumstantial evidence to show how an illegal vote was cast. *Canales* does not, however, authorize the *invalidation of an election when, as here, the challenger has presented* virtually *no* evidence as to how individual ballots were cast.[5]

Finally, the majority points to "widespread illegal voting practices . . . permeat[ing] this election—including fraud and tampering" and "nearly all of the candidates themselves, knowingly or otherwise, [taking] part in the malconduct . . . ." (Maj. opn., *ante,* p. 285.) These "illegal voting practices" may well independently require the invalidation of the election in this case. They do not, however, permit us to set aside the election because of illegally cast ballots. To do so requires, under section 20024, evidence showing for whom the illegal ballots were cast, and evidence that a sufficient number of them were cast for the prevailing candidate so that the outcome of the election would be affected. Such evidence was not presented here.[6]

---

[5]Although there was ample evidence that showed which candidates BAPAC wanted voters to elect, this, in my view, does not constitute evidence of the preferences of the voters themselves. If BAPAC had been running a "slate" of candidates in the election or if VEP workers had consistently told absentee voters whom to vote for, one could perhaps draw the inference that voters agreeing to have their ballots delivered to them by the VEP desired the election of BAPAC's candidates. As I have explained, however, BAPAC made no official endorsements of any candidates in the election, and the record only shows a few isolated instances in which VEP workers told absentee voters for whom to vote.

[6]If, as the majority asserts, there is sufficient evidence to set aside the elections under section 20024, the majority should, at the same time, declare new winners rather than hold new elections. Section 20087 provides: "If in any election contest it appears that another person than the defendant has the highest number of legal votes, the court shall declare that person elected." If the majority is correct in concluding that it "appears" that the number of illegal votes cast for the prevailing candidates would reduce their vote totals below those of

## IV

In concluding that the school board elections challenged in this case may not be set aside on the ground of illegally cast votes, I do not necessarily conclude that plaintiffs' challenge to the election must be rejected. Although the trial court focused on plaintiffs' challenge to the election under section 20021(d) (the casting of illegal votes), plaintiffs did also challenge the election under section 20021(c), which permits a challenge on the ground that "the defendant has given to any elector or member of a precinct board any bribe . . . or has committed any other offense against the elective franchise defined in Division 17 (commencing with section 29100)."

An election challenge based on illegally cast votes may be sustained only if it meets the standard set forth in section 20024. As I have explained, the evidence offered in this case is insufficient, under section 20024, to support the trial court's order setting aside the election. But a challenge to an election based on section 20021(c) is subject to no such limitation; indeed, the Elections Code contains no limitation whatsoever on a trial court's power to invalidate an election under section 20021(c). (*Stebbins* v. *White* (1987) 190 Cal.App.3d 769, 790 [235 Cal.Rptr. 656].)

In this case, because it concluded that the election of each of the successful school board candidates should be set aside under section 20024, the trial court did not determine whether the candidates had violated section 20021(c). The court did, however, find a "wholesale violation of the mandatory requirements of the absentee voting laws in this case." The majority agrees, concluding that "clear and convincing evidence established pervasive illegalities that permeated the election process" (maj. opn., *ante*, p. 282), and listing various Elections Code violations that were "arguably established" on this record. (Maj. opn., *ante*, p. 274, fn. 4.)

I express no view on whether the election in this case should be set aside under section 20021(c). Such a conclusion would be premature in the absence of factual findings by the trial court on the issue. Each candidate's involvement in offenses against the elective franchise must be separately examined, because under section 20021(c) a challenge may be sustained only if "the defendant" (i.e., the successful candidate) engaged in such

---

other candidates for the same office," then it should equally "appear" that those other candidates should be declared the winners under section 20087, at least in the districts in which the number of unsuccessful challengers equalled the number of seats available. In the West Park district, for example, there were two positions open, for which there were four candidates. If, as the majority apparently concludes, the prevailing candidates have fewer legally cast votes than the other two, the latter candidates should be declared elected.

violations.[7] It is thus possible that some of the elections should be set aside and others should not, depending on whether the particular candidate was a party to violations of the election laws. Accordingly, I would direct the Court of Appeal to remand the matter to the trial court with directions to determine which of the defendants, if any, committed offenses against the elective franchise that would warrant invalidating their election under section 20021(c).

## V

The majority speaks at length of the importance of safeguarding the integrity of the electoral process, and this proposition is beyond dispute. But as judges sworn to uphold the law we are not free to safeguard the electoral process in whatever way we think best; we must work within the statutory framework of elections laws. Under those laws, a court may invalidate an election on the basis of illegal ballots only if the challenger produces clear and convincing evidence of how those ballots were cast. In this case, plaintiffs failed to make the required showing, and therefore this one basis for invalidating the election—illegal ballots—is not available.

This conclusion, however, does not mean that an election must be upheld even in the face of pervasive voter fraud. The majority disregards another basis for invalidating an election, one that was pleaded and may well be available in this case: election law violations by the apparent winner of the election. Under the circumstances, the best means of preserving the democratic electoral process, without departing from the statutory framework, is to permit the trial court to determine the unresolved issues concerning the candidates' responsibility for the election law violations that the trial record has demonstrated.

Appellants' petition for a rehearing was denied July 15, 1993, and the opinion was modified to read as printed above. Kennard, J., was of the opinion that the petition should be granted.

---

[7]In my view (I am unaware of any case that has addressed the issue) an election may also be set aside under section 20021(c) if a person whose actions are directed or ratified by a prevailing candidate engages in such violations.